**SAYLES HYDRO ASSOCIATES, a California General Partnership; Joseph M. Keating, Plaintiffs–Appellees,**

v.

**W. Don MAUGHAN; Darlene E. Ruiz; Danny Walsh; Edwin H. Finster; Eliseo M. Samaniego, Defendants–Appellants,**

**State Water Resources Control Board, Intervenor–Appellant.**

No. 91–15934.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1992.

Decided Feb. 1, 1993.

---

Clifford T. Lee, Deputy Atty. Gen., San Francisco, CA, for defendants-appellants and intervenor-appellant.

Stuart L. Somach, of De Cuir & Somach, Sacramento, CA, for plaintiffs-appellees.

Before ALARCON, HALL and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This case involves the scope of federal preemption of state regulatory authority under the Federal Power Act. The district court granted summary judgment to the federal licensees on the ground that Congress has occupied the field, and therefore the state lacks the power to do anything but determine proprietary water rights. The district judge thought that a recent decision of the Supreme Court, *California v. FERC*, 495 U.S. 490, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990), left room for no other conclusion. We agree, and affirm.

Keating and Sayles have a license from the Federal Energy Regulatory Commission to build and operate a small hydroelectric power project (a 130' long, 8.4' high dam, with a 2.3 acre reservoir) in a national forest in California. They could not operate it, because the California State Water Resources Control Board (State Board) would not issue a permit. Keating and Sayles sued for and won a declaratory judgment and injunction, which the members of the State Board now appeal.

No one else claims any conflicting water rights, and the Board knows of no impact the project would have on any prior water rights within the watershed. The problem has been that the State Board has required a shifting, expanding range of reports and studies, to assure that the project satisfies the State Board's concerns regarding recreation, aesthetics, archaeology, sport fishing, and cultural resources, and that the project meets the State Board's standards regarding cost of capital and estimated revenues.[1] Most or all of these same concerns were addressed by the Federal Energy Regulatory Commission, which conditioned the license on compliance with numerous environmental requirements. Keating and the State Water Board have been working at these issues since 1980. The State Board and Keating have reached an impasse. He will not undertake any more studies, and the State Board will not hold hearings on his water rights application without them.

We review a grant of summary judgment de novo. *Kruso v. Int'l Telephone & Telegraph Corp.*, 872 F.2d 1416, 1421 (9th Cir. 1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).

## I. RIPENESS.

█ We would have no jurisdiction to decide the preemption controversy, were it not ripe. *Pacific Gas & Electric Co. v. State Energy Resources Cons. and Dev. Comm.*, 461 U.S. 190, 200–203, 103 S.Ct. 1713, 1720–1722, 75 L.Ed.2d 752 (1983). The State Board argues that Sayles' claim is premature. Because no permit requirements will be imposed by the State Board until the completion of the state water rights permit process, it argues that we cannot determine at this stage whether its requirements would conflict with federal requirements. This argument fails for two reasons. First, as we explain below, Congress has occupied the entire field, so preemption will not depend on whether the state requirements conflict with the federal requirements. Second, occupation of the field implies as a corollary that the state process itself, regardless of the results, is preempted.

As Sayles characterizes the State Board's position,

a FERC licensee must jump through hoop after hoop that the State Board holds up, preparing environmental impact reports for the licensed project and additional environmental, economic, and other studies, regardless of the time and expense involved. If and when the licensee has jumped through the hoops to the State Board's satisfaction, and if and when the State Board issues a permit, only then can the licensee argue that the State Board may not force the licensee to jump through the hoops or challenge binding conditions of the permit that are based on the analyses.

Appellee's brief at 30.

█ Ripeness of an issue depends on two things, its current fitness for judicial deci-

---

1. In its reply brief, the State Board concedes that it cannot condition its permit on financial requirements inconsistent with the Federal Energy Regulatory Commission's approval.

sion, and the hardship to the parties of withholding judicial consideration. *Pacific Gas,* 461 U.S. at 201, 103 S.Ct. at 1720–1721. The question of whether the Federal Power Act "occupies the field" and thereby preempts state law is "purely legal" and does not depend on what the State Board may do at the end of its process, so it is currently fit for judicial decision. *Cf. Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 747 (9th Cir.1978). If Congress has "occupied the field," anything the State Board does except for deciding proprietary water rights conflicts with federal law.

The hardship is the process itself. Process costs money. If a federal licensee must spend years attempting to satisfy an elaborate, shifting array of state procedural requirements, then he must borrow a fortune to pay lawyers, economists, accountants, archaeologists, historians, engineers, recreational consultants, environmental consultants, biologists and others, with no revenue, no near-term prospect of revenue, and no certainty that there ever will be revenue. Meanwhile, politics, laws, interest rates, construction costs, and costs of alternatives change. Undue process may impose cost and uncertainty sufficient to thwart the federal determination that a power project should proceed. As the Supreme Court explained in an analogous context, "[t]o require the industry to proceed without knowing whether the [state regulation] is valid would impose a palpable and considerable hardship on the utilities, and may ultimately work harm on the citizens of California." *Pacific Gas,* 461 U.S. at 201–202, 103 S.Ct. at 1721.

## II. PREEMPTION.

■■■■ On its face, the language of the Federal Power Act is capable of different interpretations concerning the preemption issue. The statute authorizes the Federal Energy Regulatory Commission, formerly the Federal Power Commission, to issue licenses for dams to generate electrical power. 16 U.S.C. § 797(e). Yet state authority is preserved over control, appropriation, use and distribution of water:

Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.

16 U.S.C. § 821. We cannot, however, construe this statute on a blank slate. The Supreme Court has read the broadest possible negative pregnant into this "savings clause." *First Iowa Hydro–Electric Coop. v. Federal Power Comm'n, State of Iowa,* 328 U.S. 152, 176, 66 S.Ct. 906, 917, 90 L.Ed. 1143 (1946). The rights reserved to the states in this provision are all the states get. The State Board before us in this case has litigated this very matter before the United States Supreme Court and lost. *California v. FERC,* 495 U.S. 490, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990).

*First Iowa* involved circumstances similar to the instant case. The Federal Power Commission wanted the project to proceed, but the State of Iowa did not, unless the power cooperative first demonstrated compliance with Iowa law regarding pollution, fish protection, construction, diversion of streams, and other requirements. The diversion of a river, prohibited by state law, was the exact means selected by the Federal Power Commission to generate a maximum amount of electricity. The Supreme Court held that the state and federal authorities do not "share in the final decision of the same issue." *Id.* 328 U.S. at 168, 66 S.Ct. at 913. The Court quoted Representative LaFollette's explanation, that the savings provision relates to "the property rights of the States ... and we are trying in this bill ... to overcome a divided authority and pass a bill that will make it possible to get development." *Id.* at 174, 66 S.Ct. at 916. The Court then construed the savings clause as limited to proprietary rights in water:

The effect of § [821], in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses of the same nature. It therefore has primary, if not

exclusive, reference to such proprietary rights. *Id.* at 175–76, 66 S.Ct. at 917.

■ In many states where water is scarce, a state property law regime enables users of streams and wells to obtain proprietary rights in a continuing quantity of water. By perfecting state water rights, users can enjoin other users who deprive them of their share of the flow. *See* Getches, Water Law 1–11 (1984). This state property law regime in water is what the savings clause reserves, under *First Iowa.* Such proprietary rights are not at issue in the case before us. The parties' stipulation of facts says that there are no protests to the application based on injury to prior water rights, and the State Board knows of no impact that the project would have on prior water rights. Since forcing Sayles and Keating to provide environmental impact reports to the State Board has nothing to do with determining proprietary rights in water, federal preemption bars the state requirements.

The language of *First Iowa* was broad, but its facts arguably left room to treat its construction of § 821 as dictum, because that case involved a conflict between state and federal requirements. The State Board proposed this reading to the Supreme Court in *California v. FERC*, 495 U.S. 490, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990). The Court rejected it. *Id.* at 500–01, 110 S.Ct. at 2030–31. The Court read the ratio decidendi of *First Iowa* as necessarily construing the savings provision "to encompass only laws relating to proprietary rights." *Id.* at 502, 110 S.Ct. at 2031. The Court held that the California minimum stream flow requirement did not reflect proprietary rights in water, so, under *First Iowa*, federal preemption barred the state regulation.

■ The State Board urges that we read *California v. FERC* as establishing federal preemption only where a state requirement conflicts with a federal requirement, not

where it supplements a federal requirement. Federal preemption has sometimes been explained as two distinct categories. In one kind, sometimes called "occupy the field" preemption, the federal role is so pervasive that no room is left for the states to supplement it. In the other, sometimes called "conflict" preemption, state law is preempted to the extent that compliance with both laws is physically impossible, or state law would be an obstacle to the accomplishment of the full purposes and objectives of Congress. *Pacific Gas*, 461 U.S. at 204, 103 S.Ct. at 1722; *see also, Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984).

*California v. FERC* could have been decided as a conflict preemption case. The federal and state authorities imposed requirements of a minimum number of cubic feet per second of water to flow despite the diversion, to protect trout in the stream. California required a higher minimum than the Federal Energy Regulatory Commission. Although it was not physically impossible for the developer to comply with both, allowing California to require higher flow requirements would interfere with the federal agency's "comprehensive planning authority," creating an obstacle to achievement of the federal purpose. *Id.* 495 U.S. at 506, 110 S.Ct. at 2033. The ratio decidendi, however, does not take that course. Instead, *California v. FERC* reaffirms *First Iowa's* narrow interpretation of the savings provision, so that the only authority states get over federal power projects relates to allocating proprietary rights in water. *First Iowa* said that the separation of authority between state and federal governments "does not require two agencies to share in the final decision of the same issue." *First Iowa*, 328 U.S. at 167–68, 66 S.Ct. at 913. *California v. FERC* reaffirms *First Iowa*, uses the "occupy the field" characterization "broad and paramount federal regulatory role," *California v. FERC*, 495 U.S. at 499, 110 S.Ct. at 2030,[2] and plainly states that "constricting

---

**2.** The Court interprets 1986 amendments to the Federal Power Act requiring the Commission to solicit and consider recommendations from state agencies on such matters such as recreation, fish and wildlife, and cultural resources as Congressional elaboration and reaffirmation of the "broad and paramount" federal role.

§ 27 to encompass only laws relating to proprietary rights" accomplishes this "no sharing" purpose. *Id.* at 502–03, 110 S.Ct. at 2030–31.

Even though the ratio decidendi in *California v. FERC* is straight "occupy the field" preemption, the State Board correctly characterizes words used in the last part of the opinion, where the rule is applied to the facts, as conflict preemption language. The dichotomy between the two types of preemption is not so sharp in practical terms as the legal categorization makes it appear, so the mixed language has little significance. The state process itself would be an obstacle to the accomplishment of the full purposes and objectives of Congress in authorizing the Federal Energy Regulatory Commission to license the project to proceed. *Cf. Silkwood, supra.* As explained above in the discussion of ripeness, undue process in itself burdens a project. Once the Court made it clear that the state could control only proprietary rights to water, that established the category as "occupy the field" preemption for everything but proprietary rights to water.

In the case at bar, it is clear that the federal laws have occupied the field, preventing state regulation. This conclusion is strengthened by the fact that most or all of the State Board's concerns were considered by the Federal Energy Regulatory Commission in granting the license, and conditions were imposed in the license to protect these multiple values. This very project has already been the subject of two other decisions of this court, both relating to compliance with federal environmental requirements which overlap with the concerns of the State Board. *LaFlamme v. FERC,* 852 F.2d 389 (9th Cir.1988); *LaFlamme v. FERC,* 842 F.2d 1063 (9th Cir. 1988). There would be no point in Congress requiring the federal agency to consider the state agency recommendations on environmental matters and make its own decisions about which to accept, if the state

agencies had the power to impose the requirements themselves.

 Sayles has suggested that the appeal is frivolous and deserves sanctions. We have not gone so far as this, though the Board's unwillingness to accept the meaning of the result it obtained in *California v. FERC* gives us pause. Further litigation which appears to the District Court to be frivolous or for purposes of delay may expose the litigants or their attorneys to sanctions.

AFFIRMED.