OPINION OF THE COURT
GREENBERG, Circuit Judge.
After detailed examination of numerous technical, safety, and environmental issues, the Federal Energy Regulatory Commission (“FERC”) issued a certificate of public convenience and necessity for plaintiff-' appellant NE Hub Partners, L.P.’s (“NE Hub”) natural gas storage facility (the “Facility”) in Tioga County, Pennsylvania. The Commonwealth of Pennsylvania may seek to revisit those issues in consolidated administrative appeals in its own permitting process in a costly proceeding that will delay NE Hub’s construction of the Facility. Consequently, NE Hub brought a district court action seeking an injunction against the state appellate proceedings in an attempt to bar aspects of them on federal preemption grounds. The district court, however, rejected the claim without reaching its merits, principally on the jurisdictional ground that it was not ripe for decision before the state process concluded. See NE Hub Partners, L.P., No. 1: CA-99-0082 (M.D.Pa. Apr. 7, 2000) (“NE Hub”). We disagree with the district court on the ripeness issue and accordingly will reverse its order dismissing the action and will remand the case for further proceedings.

I. BACKGROUND

A. Factual History[1]
Since 1995 NE Hub has been seeking a plethora of federal and state permits to *337 construct the Facility. The construction is a substantial undertaking requiring NE Hub to drill through the Oriskany sand formation which contains competing storage facilities owned by Penn Fuel Gas, Inc. (“Penn Fuel”) and CNG Transmission Corp. (“CNGT”).[2] Not surprisingly Penn Fuel and CNGT have opposed NE Hub every step of the way before both FERC and the Pennsylvania agencies exercising jurisdiction over the construction.
Because the Facility will store natural gas for use in interstate commerce it is subject to FERC’s jurisdiction and thus its construction requires a certificate of public convenience and necessity (the “Certificate”) pursuant to section 7(c) of the Natural Gas Act, 15 U.S.C. §§ 717 et seq. (“NGA”). NE Hub applied for the Certificate in November 1995, but Penn Fuel and CNGT intervened and requested FERC to reject NE Hub’s application on a variety of technical, safety and environmental grounds, including a claim that the construction and use of the Facility threatened to damage their own facilities.
FERC reviewed the entire range of technical, safety, and environmental issues relating to the Facility, and, at the instance of Penn Fuel and CNGT, convened a technical conference on the application in September 1996 at which they raised the following 23 issues relating to the technical, safety, and environmental soundness of the Facility:
(1) Whether NE Hub’s Drilling and Construction Program, utilizing a large diameter drill bit, would result in massive mud loss to the Oriskany sand formation;
(2) Whether circulation materials would satisfactorily mitigate the mud loss into the surrounding geological strata;
(3) Whether test drilling performed on well TW 501 indicated that the Drilling and Construction Program would lead to massive fluid loss to the Oriskany sand formation;
(4) Whether NE Hub’s Drilling and Construction Program had sufficient documentation relating to rates of penetration that could reasonably be expected from the use of large diameter (28") drilling bits to penetrate the Oriskany sand formation;
(5) Whether NE Hub’s Drilling and Construction Program had properly taken into account fracture permeability of the Oriskany sand formation;
(6) Whether NE Hub’s Drilling and Construction Program had accounted for the pressure fluctuations it might encounter during drilling operations due to existing gas storage facilities;
(7) Whether NE Hub’s Drilling and Construction Program would result in cement invasion to the Oriskany sand formation;
(8) Whether mud loss and cement invasion cause d by NE Hub’s Drilling and Construction Program would result in irremediable damage to the deliverability of gas from the CNGT/Penn Fuel Storage;
(9) Whether NE Hub’s Drilling and Construction Program would lead to increased risk of gas leaks and catastrophic blowouts;
(10) Whether the use of large quantities of loss circulation materials in NE Hub’s Drilling and Construction Program would cause a ‘cake’ to form across the Oriskany sand formation and reduce the likelihood of achieving an adequate ce *338 ment bond between the wall of the well and the casing string;
(11) Whether NE Hub’s Drilling and Construction Program would achieve the turbulent flow required to remove loss circulation material from the Oriskany sand formation and permit the development of an adequate cement bond;
(12) Whether NE Hub’s Drilling and Construction Program required or contained sufficient contingencies in the event an adequate cement bond was not achieved;
(13) Whether NE Hub’s Drilling and Construction Program included procedures for the use of a cement bond log tool to evaluate the integrity of the cement bond between the well and casing string;
(14) Whether NE Hub’s Drilling and Construction Program would lead to fracturing of the casing shoe;
(15) Whether NE Hub’s Drilling and Construction Program would lead to overpressuring of shallow formations;
(16) Whether NE Hub’s Drilling and Construction Program would increase the likelihood of gas loss or gas migration for the CNGT/Penn Fuel Storage;
(17) Whether NE Hub’s Drilling and Construction Program would result in salt cavern subsidence;
(18) Whether NE Hub’s Drilling and Construction Program relied on proper research and data regarding the tensile and compressive strengths for salt;
(19) Whether NE Hub’s Drilling and Construction Program relied on proper mechanical integrity testing of the salt caverns;
(20) Whether NE Hub had failed to consider alternate sites for cavern development;
(21) Whether the Sandia National Laboratories report used in development of the Drilling and Construction Program adequately addressed cavern operating pressures, cavern creep and subsidence, and rock mechanics;
(22) WTiether the geologic conditions at locations targeted by NE Hub’s Drilling and Construction Program were adequate for cavern development; and
(23) Whether NE Hub should be required to obtain insurance and/or indemnities that would be available to compensate CNGT and/or Penn Fuel for potential losses arising from the construction or operation of the Facility.
App. at 20-22.
For the next year and a half FERC, in consultation with NE Hub, Penn Fuel, and CNGT and with the assistance of an outside consulting firm, exhaustively reviewed NE Hub’s proposal for the Facility, taking Penn Fuel’s and CNGT’s objections into account. In connection with this review NE Hub, Penn Fuel, and CNGT led what NE Hub has characterized as “a parade of experts and technical consultants before F.E.R.C.” See app. at 24. FERC also made an Environmental Impact Assessment of the Facility pursuant to the National Environmental Policy Act, treating at least seven issues:
(1) Requirements for NE Hub to create more than the two salt caverns approved by the Certificate;
(2) Locations of structures and facilities necessary for the Facility, including right-of-ways and the freshwater intake structure;
(3) Whether the Facility could be constructed and operated with insignificant effects on bodies of water, including rivers and streams;
(4) Whether NE Hub’s erosion and sedimentation plans were sufficient to minimize impacts on soil and bodies of water;
*339 (5)Whether NE Hub’s air pollution control plans were sufficient to minimize air quality impacts, including impacts from fugitive dust;
(6) Whether NE Hub’s water quality management and N.P.D.E.S. stormwater discharge plans were sufficient to minimize impacts on water quality; and
(7) Whether NE Hub’s land use and reclamation plans were adequate.
See app. at 23. We call these seven issues along with the 23 issues enumerated above the “30 Issues”. In addition, FERC considered competitive and market issues.
On April 20, 1998, FERC issued the Certificate in a 93 page order. See app. at 39 et seq. The order stated that FERC had exercised its jurisdiction over the Facility and found that it could be constructed and operated safely. See app. at 24. The order, however, imposed various conditions on the construction and operation of the Facility, and stated that “NE Hub must comply with the State of Pennsylvania’s drilling regulations,” app. at 101, and that “[regulation of underground storage safety is at the state level.” App. at 66. It also stated:
Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities[3] by this Commission.[4]
App. at 109.
Even before FERC issued its order NE Hub had applied to the Pennsylvania Department of Environmental Protection (“Pa.D.E.P.”) for the requisite state permits and thus it was proceeding on parallel regulatory paths. See app. at 25. While Pa.D.E.P. had monitored the FERC proceedings, it chose not to seek to intervene in them as it could have under 15 U.S.C. § 717n(a) and 18 C.F.R. § 385.214(a)(2). See app. at 25. Penn Fuel and CNGT raised each of the 30 Issues in repeated appearances before Pa.D.E.P. but nevertheless on July 17, 1997, Pa.D.E.P. issued the permits NE Hub sought. See app. at 25-26.
Over the next year Penn Fuel and CNGT filed three appeals protesting issuance of the state permits with the Environmental Hearing Board for the Commonwealth of Pennsylvania (“E.H.B.”), which is authorized to hear such appeals. All the individual defendant-appellees remaining in this action, ie., all defendants except Penn Fuel and CNGT, are administrative law judges on the E.H.B., to whom we will refer collectively as E.H.B. In the appeals to E.H.B., which have since been consolidated, see app. at 26, Penn Fuel and CNGT again raised each issue they had advanced before FERC, including the 30 Issues, and presented testimony and documentation they had presented to FERC. See app. at 27. E.H.B. has not decided the appeals but the Pa.D.E.P. permits are valid pending its decision. See app. at 1021.

B. Procedural History

On January 15, 1999, NE Hub filed a complaint in the district court against Penn Fuel, CNGT, E.H.B. and James M. Seif, the Secretary of Pa.D.E.P., asking for a declaratory judgment that the NGA preempted the Pa.D.E.P. and E.H.B. review process. NE Hub also requested an order enjoining the E.H.B. proceedings and “such other relief as this Court deems *340 just and proper.” See app. at 32. However, NE Hub in the district court and in this court pared the scope of its requested relief down to the 30 Issues, and renounced any claim that the Certifícate completely bars state regulation of the Facility in areas outside the 30 Issues.[5] The complaint also sought a declaratory judgment and injunctive relief barring Penn Fuel and CNGT from relitigating the 30 Issues before Pa.D.E.P. and E.H.B. because in NE Hub’s view this relitigation would amount to an appeal of the FERC order, which they could prosecute only pursuant to 15 U.S.C. § 717r(a). See app. at 32 — 33.
Secretary Seif settled with NE Hub on June 30, 1999, stipulating that Pa.D.E.P. lacked authority to regulate the Facility with respect to the 30 Issues, and thus the district court dismissed him as a party on July 2, 1999. See NE Hub, slip op. at 9; app. at 842-59. All other defendants, ie., the appellees here, moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) on a variety of grounds, including ripeness, the Eleventh Amendment, abstention, and the Anti Injunction Act. The parties agreed to stay the E.H.B. proceedings pending the outcome of this case. See NE Hub, slip op. at 8.
The district court, in a Memorandum and Order dated April 7, 2000, granted the appellees’ motions and dismissed NE Hub’s complaint without prejudice. See id. at 21. The court parsed NE Hub’s claim against E.H.B. into two theories of preemption: one claiming preemption only insofar as the state process conflicted with the Certificate, the other claiming a right to be completely free from any state regulation. The court dismissed the action with respect to the conflict theory for lack of ripeness because E.H.B. had not yet taken an action that could interfere with the federal regulations and the court believed that the requirement that NE Hub go through the state review process was not in itself a cognizable harm in the conflict preemption context. See id. at 15-18. The court dismissed the action with respect to the total exemption from regulation theory on the grounds that NE Hub’s contentions challenged the terms of the Certificate requiring the obtaining of state permits and thus should have been presented to FERC for rehearing under 15 U.S.C. § 717r(a), which precludes judicial review of FERC orders prior to rehearing by FERC. See NE Hub, slip op. at 18-19. The court then found that its jurisdiction with respect to NE Hub’s claims against Penn Fuel and CNGT depended on its jurisdiction over the claims against E.H.B., and, as the latter was lacking, so was the former. See id. at 19-20. Accordingly, it dismissed the action in its entirety.
NE Hub then timely filed this appeal contending that the district court erred in dismissing its preemption claim for lack of ripeness. See NE Hub’s Br. at 3. NE Hub further contends that it is not challenging FERC’s order and thus it argues that the district court erred in holding that this action is barred because it has not sought rehearing of the FERC order.

II. JURISDICTION

We have jurisdiction over this appeal of a final judgment of the district court pursuant to 28 U.S.C. § 1291.[6] The *341 district court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337, because the case arose under the Supremacy Clause in Article VI of the United States Constitution, and the NGA.

III. STANDARD OF REVIEW

Our review of a dismissal for lack of ripeness is plenary. See Philadelphia Fed’n of Teachers v. Ridge, 150 F.3d 319, 321 (3d Cir.1998); see also Gould Elecs, v. United States, 220 F.3d 169, 176 (3d Cir.2000). Moreover, when, as here, defendants move to dismiss a complaint under Rule 12(b)(1) for failure to allege subject matter jurisdiction we treat the allegations of the complaint as true and afford the plaintiff the favorable inferences to be drawn from the complaint.[7] See Mortensen v. First Fed. Sav. & Loan Ass’n, 549 F.2d 884, 891 (3d Cir.1977); see also Fed.R.Civ.P. 8(f).

TV. ANALYSIS

A. Ripeness

The Supreme Court stated the purpose and effect of the ripeness doctrine in the context of interfering with an administrative process in Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967):
[T]o prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.
In some circumstances the ripeness requirement is drawn from Article III limitations on judicial power and in others from prudential limitations. See Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 733 n. 7, 117 S.Ct. 1659, 1664 n. 7, 137 L.Ed.2d 980 (1997); see also Ridge, 150 F.3d at 323 n. 3 (noting ambiguity over whether ripeness is a prudential limitation on federal jurisdiction or is required by the case-or-controversy requirement of Article III of United States Constitution); Travelers Ins. Co. v. Obusek, 72 F.3d 1148, 1154 (3d Cir.1995) (same); Armstrong World Indus., Inc. v. Adams, 961 F.2d 405, 411 n. 12 (3d Cir.1992) (same). Ripeness is a matter of degree whose threshold is notoriously hard to pinpoint. See, e.g., Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941) (“The difference between an abstract question and a ‘controversy’ contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test....”); McCahill v. Borough of Fox Chapel, 438 F.2d 213, 215 (3d Cir.1971) (“The considerations, while catholic, are not concrete.”); Step-Saver Data Sys., Inc. v. Wyse Tech., 912 F.2d 643, 646 (3d Cir.1990) (“it is difficult to define the contours of the ripeness doctrine with precision”) (footnote omitted).
The Supreme Court in Abbott Labs laid out two fundamental considerations for determination of a ripeness question: (1) “the fitness of the issues for judicial decision,” and (2) “the hardship to the parties of withholding court consideration.” [8] 387 U.S. at 149, 87 S.Ct. at 1515. *342 In the context of declaratory judgments, we generally analyze ripeness under the threefold rubric of Step-Saver, 912 F.2d at 647, as did the district court here: first, the adversity of the parties’ interests; second, the probable conclusiveness of a judgment; third, the practical utility to the parties of rendering a judgment.[9] See Pic-A-State Pa., Inc. v. Reno, 76 F.3d 1294, 1298 (3d Cir.1996).
1. Adversity
NE Hub claims that the state permit process with respect to the 30 Issues is preempted but that E.H.B. nevertheless will continue with that process unless enjoined. In these circumstances, NE Hub’s and E.H.B.’s interests hardly could be more adverse.
Nevertheless, the district court held NE Hub’s interests insufficiently adverse to E.H.B.’s because:
In order to demonstrate that its claims are ripe, NE Hub must show that the probability of the EHB Defendants acting adversely to NE Hub is real and substantial.... [T]he Environmental Hearing Board Defendants have not, as yet, taken any action or issued any decision potentially conflicting with the 7(c) certificate. Further, it is entirely possible that the Environmental Hearing Board will uphold the issuance of the permits by [Pa.D.E.P.] and will never issue any decision conflicting with the federal regulatory scheme.
See NE Hub, slip op. at 15-16.[10] This analysis, which focuses on the possible ultimate result of the state regulatory process, does not take into account the case law that preemption may operate to spare a party from that very process. In fact, the process itself may give rise to adversity so that an action challenging the process is ripe even before the process concludes. Thus, in Freehold Cogeneration Associates, L.P. v. Board of Regulatory Commissioners, 44 F.3d 1178 (3d Cir.1995), we held that a preemption challenge to ongoing proceedings before the New Jersey Board of Regulatory Commissioners invading FERC’s domain was ripe even though “the plaintiff did not challenge the ultimate substantive decision, but rather its authority to conduct proceedings”:
*343 [T]he issue here is ripe for adjudication. The proceedings before the [state agency] have been ongoing for nearly one year. The interest that Freehold seeks to vindicate in this proceeding is the right to be free from ‘state laws ... respecting the rates ... of electric utilities’ and from the expense, delay, and uncertainty inherent in the administration of such laws. If, as Freehold insists, the ongoing [state agency] proceedings constitute state regulation of utility rates and the burdens on Freehold occasioned by those proceedings are the kinds of burdens which Congress intended [certain facilities] to be spared, Congress’ mandate would be frustrated if Freehold’s right to judicial review were postponed. There is a concrete dispute that has already worked a severe hardship upon Freehold, and a determination of the legal issue of preemption need not await any further developments....
Id. at 1189.
In Sayles Hydro Associates v. Maughan, 985 F.2d 451, 453-54, 456 (9th Cir.1993), a California state water board withheld a hydroelectric plant permit because the applicant did not supply certain reports and studies. The court held that a claim that the Federal Power Act preempted the ongoing state permitting process by occupying the field of power projects regulation was ripe, explaining as follows:
The hardship is the process itself. Process costs money. If a federal licensee must spend years attempting to satisfy an elaborate, shifting array of state procedural requirements, then he must borrow a fortune to pay lawyers, economists, accountants, archaeologists, historians, engineers, recreational consultants, biologists, and others, with no revenue, no near-term prospect of revenue, and no certainty that there ever will be revenue. Meanwhile, polities, laws, interest rates, construction costs, and costs of alternatives change. Undue process may impose cost and uncertainty sufficient to thwart the federal determination that a power project should proceed.
Id. at 454. Similarly the court in Middle South Energy, Inc. v. Arkansas Public Service Commission, 772 F.2d 404 (8th Cir.1985), found ripe a claim based on preemption and the Commerce Clause against ongoing Arkansas state agency proceedings determining whether to void certain interstate power purchase contracts claimed to be within FERC’s sole jurisdiction. The plaintiff successfully
challenge[d] not the state’s ultimate substantive decision but its authority even to conduct the contemplated proceeding. It can hardly be doubted that a controversy sufficiently concrete for judicial review exists when the proceeding sought to be enjoined is already in progress.
Id. at 410-11.
Courts have found insufficient adversity for ripeness where the chance of the defendant acting against plaintiff is but a “contingency.” See, e.g., Presbytery of N.J. v. Florio, 40 F.3d 1454, 1464-68, 1470 (3d Cir.1994) (insufficient adversity where state said it would not enforce challenged law against plaintiff); Armstrong World Indus., 961 F.2d at 413-14 (insufficient adversity between state and plaintiffs challenging validity of takeover law, because takeover of plaintiffs was “contingency which may not occur,” in which case they would not suffer from law). Here, however, there is little doubt that E.H.B. will continue with the permit review process, and that the process itself is the alleged harm.
We recognize that E.H.B. in its proceedings has not yet taken a position on whether it will reconsider the 30 Issues, and if so in what depth. Thus, arguably its interest is not substantively adverse to that of NE Hub. See Step-Saver, 912 F.2d at 648. Nevertheless, inasmuch as the process creates the adversity and E.H.B. has not disclaimed a right to reexamine the issues we hold that its inter est is adverse to that of NE Hub. See Supplemental letter brief of *344 E.H.B. at 4, Sept. 13, 2000 (“Because of the structure and nature of its adjudicatory function, it is not possible for the EHB to determine what issues will be brought to its attention by CNGT and Penn Fuels in their challenge to NE Hub’s permits.”). At oral argument before us E.H.B. adhered to that position.
2. Conclusivene ss
Conclusiveness is a short-hand term for whether a declaratory judgment definitively would decide the parties’ rights. See Step-Saver, 912 F.2d at 648. It also addresses the extent to which further factual development of the case would facilitate decision, so as to avoid issuing advisory opinions, or whether the question presented is predominantly legal. See Travelers Ins. Co., 72 F.3d at 1155. In this case, a declaratory judgment would establish that E.H.B. may or may not review and base its permit decision on a consideration of the 30 Issues, a conclusive result.
Furthermore, additional factual development is unnecessary. We need not await the result of the E.H.B. process to ascertain whether a judgment will be conclusive because NE Hub’s contention is that the process itself is preempted as to the 30 Issues regardless of what the outcome of a proceeding before the E.H.B. would be as to those issues. Moreover, a determination of whether there is preemption primarily raises a legal issue, a circumstance which facilitates entry of a declaratory judgment. See Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm’n, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720-21, 75 L.Ed.2d 752 (1983) (“The question of preemption is predominantly legal, and although it would be useful to have the benefit of [the state’s interpretation and application of its regulations], resolution of the pre-emption issue need not await that development.”); Travelers Ins. Co., 72 F.3d at 1155 (preemption is predominantly legal question conducive to declaratory judgment); Freehold Cogeneration Assocs., 44 F.3d at 1188 (judgment would be conclusive because, inter alia, factual developments at ongoing state proceedings would not add to construction of allegedly preemptive federal statute); cf. Abbott Labs., 387 U.S. at 149, 87 S.Ct. at 1515 (issue ripe for decision because, inter alia, it is “a purely legal one”).
The district court held that a judgment would be inconclusive because
without knowing whether Commonwealth will ultimately deny project authority and on what ground, it is impossible to determine whether its requirements burden or delay the NE Hub Project to such an extent so as to be preempted by the 7(c) certificate.
See NE Hub, slip op. at 16. Again, this statement overlooks that the state regulatory process itself can be the preempted burden. See discussion, infra, in part IV B of Freehold Cogeneration Assocs., Sayles Hydro Assocs., and Middle South; see also National Fuel Gas Supply Corp. v. Public Service Comm’n, 894 F.2d 571, 578 (2d Cir.1990) (finding state regulations of gas lines preempted for inconsistency with FERC permits because “[e]ven if a [gas] transporter were successful before the [state commission], the practical effect would be to under mine the F.E.R.C. approval by imposing the costs and delays inherent in litigation that must be undertaken without any guidelines as to the limits on the exercise of state authority”); cf. Pacific Gas & Elec. Co., 461 U.S. at 201-02, 103 S.Ct. at 1721 (preemption claim against moratorium on new nuclear power plants ripe because “to require the industry to proceed without knowing whether the moratorium is valid would impose a palpable and considerable hardship on the utilities, and may ultimately work harm on the citizens of California”).
3. Practical Utility
Practical utility goes to “whether the parties’'plans of actions are likely to be affected by a declaratory judgment,” Step-Saver, 912 F.2d at 649 n. 9, and considers *345 the hardship to the parties of withholding judgment. See Freehold Cogeneration Assocs., 44 F.3d at 1189 (discussing hardship to preemption plaintiff of delay under utility prong of Step-Saver). A declaratory •judgment “must be of some practical help to the parties. The Declaratory Judgments Act was enacted to clarify legal relationships so that plaintiffs (and possibly defendants) could make responsible decisions about the future.” Travelers Ins. Co., 72 F.3d at 1155 (quotation and citation omitted).
A holding that the state proceedings are preempted obviously would be useful to NE Hub, which would be spared the hardships associated with the E.H.B. proceedings. NE Hub alleges that it is being put to considerable delay and expense by these proceedings in connection with the issues already dealt with by FERC.[11] See, e.g., app. at 981-82. As we stated above, the requirement to go through a burdensome process can constitute hardship for purposes of ripeness. See, e.g., Freehold Cogeneration Assocs., 44 F.3d at 1188-89; Sayles Hydro Assocs., 985 F.2d at 453-56; National Fuel Gas, 894 F.2d at 578-79; Middle South Energy, 772 F.2d at 410-411. Resolving the preemption question now also will eliminate the possibility that E.H.B. may overturn the Pa.D.E.P. permits on allegedly preempted grounds. Cf. Pacific Gas & Elec., 461 U.S. at 201-02, 103 S.Ct. at 1720-21 (uncertainty entailed by existence of state procedures part of harm cognizable in assessing ripeness of preemption claim); Sayles Hydro Assocs., 985 F.2d at 454 (same); but see Ridge, 150 F.3d at 323-26 (uncertainty as to way new procedures for determining pension levels would be applied insufficient hardship to ripen due process claim).
The district court found that there was not a hardship because (1) the E.H.B. proceedings would not necessarily result in meaningless rehashing of issues, (2) additional process cannot constitute ripeness hardship, and (3) no state regulation presently stands in NE Hub’s way. See NE Hub, slip op. at 17-18.
The first proposition is correct but beside the point: there may be some issues that E.H.B. can consider outside of the 30 Issues. Indeed, NE Hub asks that the proceedings before the E.H.B. be preempted only to the extent of precluding review of the 30 Issues. Thus, NE Hub does not suggest that federal preemption precludes E.H.B. from considering other issues.[12] If the state process is preempted with respect to the 30 Issues, then undergoing the E.H.B. process with respect to those issues is a hardship cognizable for preemption purposes, and thus for determining ripeness of NE Hub’s preemption claims.
For the second proposition, the district court quoted two cases:
[T]he Court has not considered ... litigation cost-saving sufficient by itself to justify review in a case that would otherwise be unripe. The ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of— even repetitive' — post-implementation litigation.
Ohio Forestry Ass’n, Inc. v. Sierra Club, 523 U.S. 726, 118 S.Ct. 1665, 1671, 140 L.Ed.2d 921 (1998).
[T]he burden of participating in further administrative and judicial proceedings *346 ... do[es] not constitute sufficient hardship for the purposes of ripeness.
Florida Power & Light Co. v. EPA, 145 F.3d 1414, 1421 (D.C.Cir.1998). See NE Hub, slip op. at 17. But neither case involved a claim of preemption. When such a claim has been advanced, the need to participate in a state regulatory process in conflict with federal policy has been recognized as a hardship. See, e.g., Freehold Cogeneration Assocs., 44 F.3d at 1188-89; Sayles Hydro Assocs., 985 F.2d at 453-56; National Fuel Gas, 894 F.2d at 578-79; Middle South Energy, 772 F.2d at 410-11; cf. First Iowa Hydro-Elec Co-op v. Federal Power Comm’n, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946) (hydroelectric plant project subject to jurisdiction of Federal Power Commission (FERC’s predecessor) need not obtain permit from Iowa, despite law apparently conditioning federal license on compliance with state laws). Thus, while the district court’s quotations are accurate they are not controlling precedent in the circumstances here.
Moreover, the extra litigation or administrative burden at issue in the cases quoted by the district court was apparently the burden of filing the same lawsuit later, not of undergoing an expensive and time-consuming state process. The cases quoted by the district court involved challenges to a Plan issued by the United States For est Service and a rule allegedly issued by the Environmental Protection Agency, respectively. See Sierra Club, 118 S.Ct. at 1668; Florida Power & Light, 145 F.3d at 1416. In both cases, how and even whether the Plan and rule would be applied was unclear; in Florida Power & Light, the court held the EPA had not even issued a rule. See Florida Power & Light, 145 F.3d at 1418-19. In Sierra Club, the Court stated that requiring a challenger to a rule to engage in post-implementation litigation over the rule does not constitute sufficient hardship to ripen “a case that would otherwise be unripe.” Sierra Club, 118 S.Ct. at 1671. Clearly, that holding is hardly controlling when the plaintiffs challenge is to the conduct of an administrative process that imposes an ongoing burden.
The district court’s third proposition also misses the point that process can constitute hardship. While it is true that the Pa.D.E.P. permits are valid pending the E.H.B. outcome, it is not a regulation but the regulatory process that afflicts NE Hub. If the process is preempted it is quite immaterial that the effectiveness of the permits challenged has not been stayed. Moreover, if NE Hub goes forward construction of the Facility while the E.H.B. proceedings are pending it may find itself in a difficult situation if Penn Fuel and CNGT are successful before E.H.B.

B. State regulatory process is susceptible of preemption by conflict or by field occupation.

E.H.B. contends that the cases holding a state regulatory process preempted have involved only field occupation preemption, and should be so confined and thus preemption principles are not applicable here as, in E.H.B.’s view, the NGA and FERC have not occupied the field. See E.H.B.’s br. at 17-23. The district court agreed that this case does not involve field occupation. We, however, strongly doubt that the district court was correct in this conclusion. See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 295 n. 1, 300-05, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988); Sayles Hydro Assocs., 985 F.2d at 453; Pennsylvania Med. Soc’y v. Marconis, 942 F.2d 842, 847 (3d Cir.1991); Public Utils. Comm’n v. FERC, 900 F.2d 269, 274 (D.C.Cir.1990). Nevertheless, we need not characterize definitively the type of preemption implicated here to determine ripeness, which is the only issue before us. To the extent the district court already tacitly has decided what type of preemption is involved, on remand, if it reaches the issue, it should reconsider its decision.[13]
*347 We realize that there would be a reasonable basis for a holding that process preemption should be applicable only when field preemption is implicated. The foundation for the holding would be that unless it is very clear that any result of a state permitting process either will be invalid or redundant a court should, not stop the state from considering issues that in the absence of preemption would be within state jurisdiction and instead should trust in the judgment of the state officials not to interfere unduly with a federal program.
Nevertheless, the process preemption cases do not confine themselves to the field occupation context, nor would such a limitation be wise. Even where afield has not been occupied to the exclusion of state regulation, certain state regulatory acts clearly would conflict with federal law, and it is as logical to preempt state process concerning such matters as state actions in occupied fields.[14] Indeed, even if this is a conflict preemption case, it would be quite remarkable to hold that there cannot be process preemption here inasmuch as Secretary Seif on behalf of Pa.D.E.P. in settling the case recognized that, to the extent that FERC exercised jurisdiction, Pa. D.E.P. “[djoes not have jurisdiction to consider and cannot conduct final appealable decisionmaking.” App. at 855. This recognition broadly extended to “all construction activities related to the [Facility], including the drilling and construction of the brining facilities and the technical, safety, and environmental issues which were raised before and considered by FERC.” App. at 846. While this stipulation may not be binding on the appellees, inasmuch as the state administrator himself recognizes *348 the preemptive effect of the NGA and FERC’s exercise of jurisdiction, we have good reason to recognize that conflict preemption principles might bar E.H.B. from upholding Penn Fuel’s and CNGT’s appeal on the 30 Issues.
We also point out that, as the Supreme Court recently has emphasized, the different categories of preemption are not
rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress’ intent (either express or plainly implied) to exclude state regulation.
English v. General Elec. Co., 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 2275 n. 5, 110 L.Ed.2d 65 (1990); see also Crosby v. National Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288, 2294 n. 6, 147 L.Ed.2d 352 (2000); Gade v. National Solid Wastes Management Ass’n, 505 U.S. 88, 98, 104 n. 2, 112 S.Ct. 2374, 2383, 2386 n. 2, 120 L.Ed.2d 73 (1992) (plurality opinion) (“Our ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole.” (Emphasis added.)); Sayles Hydro Assocs., 985 F.2d at 456 (“The dichotomy between the two types of preemption [conflict and field] is not so sharp in practical terms as the legal categorization makes it appear.... ”).
A comparison of the standards for identifying these two types of preemption [15] shows the reason for the blurring.[16] Conflict preemption exists where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. See e.g., Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). An occupied field is one in which the federal regulatory scheme is “so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.” Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). That inference is reasonable where any state regulation of the “occupied” subject matter would interfere with the purposes and objectives of the federal plan: a very similar standard to that for conflict preemption. See, e.g., Ray v. Atlantic Richfield Co., 435 U.S. 151, 168, 98 S.Ct. 988, 999, 55 L.Ed.2d 179 (1978) (finding field preemption of vessel regulations because “a state law in this area ... would frustrate the Congressional desire ... ”).
We therefore hold that state regulatory process may be preempted by conflict with federal law,[17] as well as by field occupation. Moreover, we reiterate that we are quite unable to understand why, regardless of the type of preemption asserted, that a claim that a state administrative process is preempted necessarily cannot be ripe when the alleged preemption is of the process itself rather than the possible outcome of the process. We also note that it would be entirely logical in an appropriate case to hold that the process is not preempted but to hold later that the result of the process is preempted.
Furthermore, if it is evident that the result of a process must lead to conflict preemption, it would defy logic to hold that the process itself cannot be preempted and that a complaint seeking that result would not raise a ripe issue. Thus, in view of the substantial showing here that E.H.B. by *349 upholding Penn Fuel’s and CNGT’s position on the 30 Issues might well reach a result that would be preempted, the process preemption claim is ripe. Of course, we hasten to add that we do not state a conclusion on whether the process actually is preempted here for, as even NE Hub recognizes, the district court should make that decision on the remand. See Presbytery of N.J., 40 F.3d at 1470.[18]

C. The need for FERC rehearing

Finally we reject the district court’s and appellees’ view that NE Hub by bringing this action was circumventing FERC’s rehearing process. In the first place, the district court reached that conclusion on the erroneous theory that NE Hub was contending “that Pennsylvania lacks authority to subject the NE Hub Project to any regulation whatsoever.” NE Hub, slip op. at 18. In fact, NE Hub does not challenge FERC’s requirement that it obtain state permits and cooperate with state and local agencies. Indeed, it has done these things. It simply contends that the E.H.B. state proceedings are preempted but only to the extent that they involve the 30 Issues considered by FERC. We see nothing in the Certificate or the NGA that precludes NE Hub’s preemption argument and it therefore follows that in making that argument NE Hub is not challenging the terms of the Certificate. Furthermore, we do not believe that a requirement that a party obtain applicable state permits and cooperate with state and local agencies in any way determines the scope of what issues a state administrative agency may consider on an appeal from the issuance of the permits.[19]

V. CONCLUSION

For the foregoing reasons we will reverse the order of April 7, 2000, dismissing this action and will remand the case to the district court to reinstate this action. On the remand the district court should consider the preemption argument on the merits unless it upholds another defense to this action.

. We take the facts we recite mainly from the complaint which, for purposes of this appeal, should be taken as true and afforded all favor *337 able inferences. See Standard of Review, Part III, infra.

. CNGT now is called Dominion Transmission, Inc. and Penn Fuel now is called PPL Gas Utilities Corporation. As a matter of convenience we nevertheless continue to refer to them as CNGT and Penn Fuel.

. Presumably "authorized” or a word of similar meaning should appear here.

. The district court interpreted this language to mean that the Certificate "was conditioned on NE Hub's obtaining any and all necessary state or local permits required to carry out the drilling and construction program.” See NE Hub, slip op. at 5. The parties agree that this interpretation is correct.

. See, e.g., NE Hub’s Resp. in Opp'n lo CNG Transmission Corp.’s Mot. to Dismiss at app. at 490 (''[T]he Complaint does not seek a declaration that NE Hub is not required to comply to any extent with state environmental or safety requirements.... NE Hub instead seeks a declaration that state authorities may not regulate or adjudicate the technical, safety or environmental issues that have already been decided by the federal agency with jurisdiction over such issues.” (Emphasis added.)); NE Hub’s Br. in Opp’n to the E.H.B. Defendants' Mot. to Dismiss at app. at 748; id. at 750-51; NE Hub’s Br. in Opp'n to James M. Seif's Mot. to Dismiss at app. at 731; id. at 734; NE Hub Appellant's Br. at 20 n. 7.

. We are not deprived of jurisdiction by reason of the dismissal having been without prejudice. See Black Horse Lane Assoc., L.P. v. Dow Chem. Corp., 228 F.3d 275, 282-87 (3d Cir.2000).

. A challenge to a complaint for failure to allege subject matter jurisdiction is known as a "facial” challenge, and must not be confused with a "factual” challenge contending that the court in fact lacks subject matter jurisdiction, no matter what the complaint alleges, as factual challenges are subject to different standards. See Mortensen v. First Fed. Sav. & Loan Ass’n, 549 F.2d 884, 891 (3d Cir.1977); 5A Wright & Miller, Federal Practice & Procedure § 1350, at 212-18 (West 1990).

. Factors relevant to the "fitness” consideration include, but are not limited to, whether the issue is purely legal (as against factual), the degree to which the challenged action is final, whether the claim involves uncertain and contingent events that may not occur as anticipated or at all, the extent to which further factual development would aid decision, and whether the parties to the action are *342 sufficiently adverse. The "hardship” consideration focuses on whether a plaintiff faces a direct and immediate dilemma, such that lack of review will put it to costly choices. See Ridge, 150 F.3d at 323.

. The Step-Saver rubric is a distillation of the factors most relevant to the Abbott Labs considerations. See Ridge, 150 F.3d at 323 n. 4. Adversity and conclusiveness apparently are subsumed under the "fitness” prong of the Abbott Labs test, while utility is relevant both to "fitness” and "hardship.” Our cases have fit the factors relevant in the Abbott Labs framework into the Step-Saver headings, as follows:
ADVERSITY:
—Whether the claim involves uncertain and contingent events, or presents a real and substantial threat of harm. See, e.g., Presbytery of N.J. v. Plorio, 40 F.3d 1454, 1466 (3d Cir.1994).
CONCLUSIVENESS:
—Whether issues are purely legal (as against factual).
—Whether further factual development would be useful.
See, e.g., id. at 1468; Travelers Ins. Co., 72 F.3d at 1155.
UTILITY:
—Hardship to the parties of withholding decision.
—Whether the claim involves uncertain and contingent events.
See, e.g., Travelers Ins. Co., 72 F.3d at 1155-56.
Of course, there may be other factors considered in a ripeness analysis.

. The district court also said NE Hub’s claim was "based on the possibility’ that state regulatory officials might enter an order that would interfere with the regulatory scheme. Pi. Mem. Supp. Prelim. Inj. at 19. That ‘possibility’ constitutes a contingency only, and is insufficient to constitute adversity of interests.” See NE Hub, slip op. at 16. That statement mischaracterizes NE Hub’s position which was that the process itself, at least as it related to the 30 Issues, interfered with the regulatory scheme. See, e.g. NE Hub’s Br. in Opp'n to the E.H.B. Defendants' Mot. to Dismiss at app. at 749-51; NE Hub’s Br. in Opp’n to James M. Seif’s Mot. to Dismiss at app. at 731, 734.

. This contention is undisputed, and is corroborated by the statement of counsel for Penn Fuel at oral argument before the district court about the expenditures of his own client: "We spent certainly in the seven figures, I would imagine, in litigating these permits before the E.H.B.” See app. at 957.

. We understand that NE Hub expects that review of any other issues will be less burdensome than a review of the 30 Issues.

. The correct result here with respect to preemption may be that we are dealing with a *347 hybrid situation in which basically there is field occupation but FERC, by requiring NE Hub to comply with state drilling regulations and indicating that regulation of underground storage safety is at the state level but providing that state and local authorities should not prohibit or unreasonably delay the construction or operation of the Facility, effectively has converted the case into a conflict preemption matter. In this regard we point out that even within an occupied field federal regulations may tolerate or authorize some exercises of state authority. See First Iowa, 328 U.S. at 167, 66 S.Ct. at 913; cf. National Fuel Gas, 894 F.2d at 579 (noting that though field of interstate gas facility regulation was occupied, FERC could choose to require licensees to obtain state permits).
It is unclear why Judge Nygaard perceives himself as disagreeing with us on this point, for he believes (a) that field preemption applies here, but also (b) "FERC properly exercised its congressionally delegated authority by requiring compliance with state permitting procedures,” dissent at 350, and (c) he acknowledges the Certificate's requirement that the results of those permitting procedures "must be consistent with the conditions [thereof]." Thus, FERC has entire control over the occupied field (field occupation), but has allowed the state a regulatory role that it may exercise only insofar as it does not conflict with FERC's decisions (conflict preemption), which is precisely the hybrid sort of preemption by which the dissent purports to be "especially troubled].” Id. at 349.
Judge Nygaard also assigns lo us a position that we nowhere take, namely, that the E.H.B. appeals conflict with federal law only because they “conflict with congressional intent to legislate exclusively.” Dissent at 353 (emphasis in original). Quite the contrary, we recognize the possibility that Congress delegated authority to FERC, and that FERC, in turn has delegated some regulatory authority to the state, which the state may exercise only insofar as it does not conflict with the decisions already made by FERC. Thus, federal rules would not be exclusive because they would not be the only ones the NE Hub must obey, but some state regulations might still conflict with the federal regulations.

. Again, it is unclear why Judge Nygaard perceives himself as disagreeing with us on this point for he "can possibly envision conflict preemption barring an on-going legal proceeding ... in which the outcome sought by the party opposing preemption is almost certain to conflict with federal law.” Dissent at 354. That is exactly what we hold. He then says that that is not the case here, because the E.H.B. might "impose additional requirements on NE Hub that do not conflict with the 7(c) certificate.” Id. That is unquestionably true but irrelevant because NE Hub does not seek preemption of the entire state process, only of the process with respect to the 30 Issues. We do not decide whether the outcome of the E.H.B. proceedings with respect to the 30 Issues would clearly so conflict. That is for the district court to decide on remand.

. We are not concerned here with express preemption which is another type of preemption.

. Contrary to the dissent? suggestion, at 352, by no means do we obliterate the distinction between the types of preemption, and we recognize the continuing existence of each. We simply note that an instance of preemption need not necessarily be pigeonholed into one category or another for purposes of analyzing ripeness.

.Federal law includes federal regulations, which have no less preemptive effect than federal statutes. See e.g., Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984).

. Our opinion should not be overread. We are not holding that any claim of process preemption necessarily is ripe so that the court should consider the preemption claim before the process is completed. It well may be that in a particular case when conflict preemption is implicated the court may conclude that it reasonably can be anticipated that the process will yield a result that is not preempted. But in this case we have an unusual situation in which the state administrator has stipulated the agency’s jurisdiction effectively has been preempted, a result which, though not binding on the appellees, if accepted would mean that a successful administrative appeal would lead to a preempted outcome.

. The dissent characterizes NE Hub's claim as a challenge to the terms of the Certificate because the E.H.B. proceeding is one "that FERC implicitly sanctioned.” Dissent at 357. But the dissent does not explain where in the Certificate FERC "implicitly sanctioned” a state proceeding insofar as it deals with measures already disposed of by FERC.
Judge Nygaard states that he and we "disagree over who should determine whether the state actions at issue were ’consistent' with FERC's certificate. The Majority believes that FERC delegated that authority to the federal courts. I believe that FERC maintained its discretion.” Dissent at 352 n. 5. Federal agencies do not "delegate” authority to decide federal constitutional and legal questions to courts; as noted above, at 357-58, federal court jurisdiction over such matters comes from Congress. We are aware of no authority granting FERC a right of first refusal to decide such questions, nor does Judge Nygaard proffer any.