Filed 9/5/19
Opinion following transfer from Supreme Court

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| COUNTY OF BUTTE, | |
| Plaintiff and Appellant, | C071785 |
| v. | (Super. Ct. Nos. 144283, 144282) |
| DEPARTMENT OF WATER RESOURCES, | Butte County |
| Defendant and Respondent; | |
| STATE WATER CONTRACTORS, INC., et al., Real Parties in Interest and Respondents. | |
| COUNTY OF PLUMAS et al., | |
| Plaintiffs and Appellants, | (Super. Ct. No. CVCV091258) |
| v. | Yolo County |
| DEPARTMENT OF WATER RESOURCES, | |
| Defendant and Respondent; | OPINION ON TRANSFER |
| STATE WATER CONTRACTORS, INC., et al., Real Parties in Interest and Respondents. | |

1

APPEAL from a judgment of the Superior Court of Yolo County, Daniel P. Maguire, Judge. Dismissed with directions.

Bruce Alpert, County Counsel; Rossmann and Moore, Antonio Rossmann, Roger B. Moore, and Barton Lounsbury; Law Office of Roger B. Moore and Roger B. Moore; and Shute Mihaly & Weinberger, Ellison Folk for Plaintiff and Appellant County of Butte.

R. Craig Settlemire, County Counsel; Law Office of Roger B. Moore and Roger B. Moore; and Law Offices of Michael B. Jackson and Michael B. Jackson for Plaintiffs and Appellants Plumas County and Plumas County Flood Control and Water Conservation District.

E. Robert Wright for Friends of the River and the California Sportfishing Protection Alliance as Amici Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris and Xavier Becerra, Attorneys General, Robert W. Byrne, Senior Assistant Attorney General, Randy L. Barrow and Tracy L. Winsor, Supervising Deputy Attorneys General, and Deborah L. Barnes and Matthew J. Goldman, Deputy Attorneys General for Defendant and Respondent Department of Water Resources.

The Sohagi Law Group, Margaret M. Sohagi and Philip A. Seymour; Duane Morris, Thomas M. Berliner, Paul J. Killion, and Jolie-Anne S. Ansley; and Downey Brand, David R.E. Aladjem for Real Parties in Interest and Respondents Alameda County Flood Control & Water Conservation District, Zone 7, Kern County Water Agency, San Bernardino Valley Municipal Water District, Santa Clara Valley Water District, The Metropolitan Water District of Southern California, and State Water Contractors, Inc.

The Department of Water Resources (DWR) applied to the Federal Energy Regulatory Commission (FERC or Commission) to extend its federal license to operate Oroville Dam and its facilities as a hydroelectric dam.[1] The project subject to relicensing is referred to as the Oroville Facilities Project (sometimes also Project or Settlement Agreement (SA)) by which the affected parties agree to the conditions for the extended license. "The SA includes Appendix A, which incorporates all of the . . . measures that

---

[1] The action does not concern the construction, repair, or replacement of the dam spillways, the need for which occurred during the pendency of this case.

2

the Settling Parties believe to be under FERC's jurisdiction."[2]  The objective of the Project is the continued operation of the Oroville Facilities for water and power generation and the implementation of conditions for the extended license.

DWR filed a programmatic (informational) Environmental Impact Report (EIR) as the lead agency in support of the application pursuant to the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; hereinafter CEQA).  Plaintiffs challenged the sufficiency of the EIR, the failure to consider the import of climate change, in the state courts and sought to enjoin the issuance of an extended license until their environmental claims were reviewed.[3]  The trial court denied the petition on grounds the environmental claims were speculative.

In an earlier opinion we held that the authority to review the EIR was preempted by the Federal Power Act (16 U.S.C. § 791a et seq.; hereinafter FPA), that the superior court lacked subject matter jurisdiction of the matter, and ordered that the case be

---

[2]  Throughout this opinion, all quotations are to the Draft Environmental Impact Report (DEIR) unless otherwise indicated.

[3]  The plaintiffs brought this action on the premise the environmental effects of relicensing the dam concern the *operation* of the dam and that jurisdiction to review the matter lies in the state courts pursuant to CEQA.  They claim that a CEQA document offered to support the DWR's application to FERC failed to consider the impact of climate change on the operation of the dam for all the purposes served by the dam.  The superior court dismissed the complaint on the ground that predicting the impact of climate change is speculative.  The plaintiffs appealed.

The plaintiffs rely on CEQA case authority to stay the relicensing procedure pending *state* judicial review of the DWR's approval of the project.  (*Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829 (*Santiago County*).)  Plaintiff Butte County requested that the state court "[e]njoin DWR's project until and unless respondent [DWR] lawfully approves the project in the manner required by CEQA . . . ."  Plaintiff County of Plumas requested that:  "Respondents and real parties in interest . . . suspend all activity under the certification that could result in any change or alteration in the physical environment until respondent has taken actions that may be necessary to bring the certification into compliance with CEQA."

3

dismissed.  Plaintiffs petitioned for review in the Supreme Court, review was granted, and the matter was transferred to us with directions to reconsider the case in light of *Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677 (*Eel River*).  We do so.

In part E of the Discussion, *post*, we have reviewed *Eel River* and determined that the Interstate Commerce Commission Termination Act (ICCTA), at issue in *Eel River*, is materially distinguishable from the FPA.  We shall conclude that *Eel River* does not apply in this case.  *Eel River* did not involve the FPA.  At issue was whether the ICCTA preempted the application of CEQA to a project to resume freight service on a stretch of rail line owned by the North Coast Railroad Authority.  The Legislature created the North Coast Railroad Authority and gave it power to acquire property and operate a railroad, to be owned by a subsidiary of the state.  The Supreme Court found the purpose of the federal law was deregulatory and the state as the owner of the railroad was granted autonomy to apply its environmental law.  For that reason, the federal law did not preempt the application of CEQA to the railroad.

INTRODUCTION

Oroville Dam was completed in 1968 as part of the State Water Project (SWP).  It blocks access to 66.9 miles of high-quality habitat for anadromous fish (salmon & steelhead).  FERC licenses are conditioned on the adoption of a plan for the "adequate protection, mitigation, and enhancement of fish and wildlife . . . and for other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes . . . ."  (16 U.S.C. § 803(a)(1).)  The Feather River Fish Hatchery was built to compensate for the loss of spawning grounds resulting from the construction of Oroville Dam.

A federal license is required by the FPA for the construction and operation of a hydroelectric dam.  The license is issued by FERC.  As we explain, with one relevant exception the FPA occupies the field of licensing a hydroelectric dam and bars review in

4

the state courts of matters subject to review by FERC. (See, e.g., *First Iowa Hydro-Electric Cooperative v. Federal Power Com.* (1946) 328 U.S. 152 (*First Iowa*).) The reason is that a dual final authority with a duplicate system of state permits and federal licenses required for each project would be unworkable. In this case the duplicate authority involves the separate NEPA (National Environmental Protection Act) and CEQA reviews of the SA. (*Ibid.*)

The exception to preemption lies with the state's authority to impose more stringent water quality conditions on the license than federally required pursuant to section 401 (33 U.S.C. § 1341; hereinafter section 401) of the Clean Water Act[4] (33 U.S.C. § 1251 et seq.).[5] In California the authority to establish the conditions is vested in the state water pollution control board (now State Water Resources Control Board (SWRCB)). (Wat. Code, § 13160 et seq.) The conditions must be set forth in a certificate to be incorporated in the license.[6] The environmental predicate for the certificate is set forth in Appendix A of the SA in both NEPA and CEQA reviews of the conditions for the license. To avoid duplication of federal and state environmental reviews, the jurisdiction to review the environmental conditions lies with FERC.

---

[4] The Clean Water Act provides: "Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of this Act [33 U.S.C. §§ 1311, 1312, 1313, 1316, 1317]." (33 U.S.C. § 1341(a)(1).)

[5] The formal name of the Clean Water Act is the Federal Water Pollution Control Act.

[6] References to a certificate is to the law generally, references to the "Certificate" are to the SWRCB certificate issued December 15, 2010. (State Water Resources Control Board, Order WQ 2010-0016 (Dec. 15, 2010).)

The DWR proposes, in fulfillment of the environmental requirements of section 803 of title 16 of the United States Code, that new measures be taken to improve the conditions of fish and wildlife affected by the presence of the dam. The measures include a commitment by DWR to develop plans to enhance, protect, restore, and/or create habitat within the FERC boundary to be set forth in a certificate. These environmental plans, referred to as the "New Project License," are subject to CEQA environmental review when implemented.[7] The DWR has selected a federal alternative procedure, an SA, for the fulfillment of its obligations. The SA involves the agreement of the parties affected by the extended license.

We shall conclude that the plaintiffs cannot challenge the environmental sufficiency of the SA in the state courts because jurisdiction to review the matter lies with FERC and plaintiffs did not seek federal review as required by 18 Code of Federal Regulations part 4.34(i)(6)(vii) (2003). Moreover, the plaintiffs did not challenge and could not challenge the SWRCB Certificate in their pleadings because it did not exist at the time this action was filed. The extended license issues upon the filing of a certificate and that cannot be delayed beyond one year from the date of a request for the certificate.[8]

---

[7] A project under CEQA involves a physical change in the environment. Public Resources Code section 21065 defines one required element of " 'Project' " as: "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect change in the environment . . . ." Because the CEQA document is programmatic it is a plan only. The implementation of the plan involves the construction of new environmental facilities required by the program, such as new spawning grounds. It is these implementations that may require review under CEQA.

[8] "Section 401(a)(1) requires that a State 'act on a request for certification[] within a reasonable period of time (which shall not exceed one year) after receipt of such request,' or else 'the certification requirements of this subsection shall be waived . . . .' " (*Alcoa Power Generating Inc. v. FERC* (D.C. Cir. 2011) 643 F.3d 963, 972.) It is only after the issuance of the license that the plan in the Certificate may be implemented.

6

Accordingly, this court has no jurisdiction of the cause tendered. We shall return the case to the trial court with an order to dismiss the complaint for lack of subject matter jurisdiction.[9]

## FACTS[10]

The Oroville FERC Project No. 2100 is located on the Feather River in the Sierra Nevada foothills in Butte County, California. The Oroville Facilities were constructed between 1961 and 1968 as part of the SWP, a water storage and delivery system of reservoirs, aqueducts, power plants, and pumping plants designed to provide flood control and to store and distribute water to supplement the needs of urban and agricultural water users in both Northern and Southern California. The Oroville Dam is the largest earthen dam in the United States. The Oroville Facilities Project is operated for power generation, water quality improvement in the Sacramento–San Joaquin Delta, recreation, fish and wildlife enhancement, and flood management. The dam is designed to access

[9] The court advised the parties that its tentative view was that the relicensing of the Oroville Dam and Oroville Facilities Project is preempted by the FPA and implementing regulations (e.g., 18 C.F.R. §§ 4.34, 385.602 (2003)) and that jurisdiction over a challenge to the issuance of the license lies with FERC. Accordingly, we advised that the case should be returned to the superior court with directions to dismiss the action for lack of federal subject matter jurisdiction. We invited the parties to submit supplemental briefs in response to our advice.

They did so and agreed that the case was subject to federal law except for the environmental program contained in a certificate prepared by the SWRCB. The plaintiffs then sought to challenge the environmental predicate for the Certificate setting forth the state's more stringent water quality provisions on the ground it also fails to consider climate change. The challenge cannot succeed because the Certificate did not exist at the time the case was filed and the program required by the Certificate cannot be challenged until it is implemented by the DWR. That has not occurred because implementation is dependent upon the filing of the Certificate. Accordingly, there is no issue regarding the implementation of the Certificate to review on appeal.

[10] The facts and procedure regarding the subject of jurisdiction appear at relevant points in the Discussion.

7

the waters of Lake Oroville at different depths to allow control of the temperature of the water discharged from the dam. The only physical change to the existing dam is the opening of a water valve to access the cold water at the bottom of Lake Oroville.[11]

The Oroville Facilities include facilities and operations to help protect and enhance fish and wildlife species and their habitat. Many of the existing environmental programs implemented within the Oroville Facilities Project boundary are cooperatively managed or are based on agreements with other agencies such as the Department of Fish and Game and the United States Fish and Wildlife Service. This includes operation and maintenance of facilities such as the Feather River Fish Hatchery and the Oroville Wildlife Area and implementation of measures developed in consultation with interested parties to protect species that are listed under the Federal Endangered Species Act and/or the California Endangered Species Act.

As an integral part of the SWP, water stored in Lake Oroville is released from the Oroville Facilities to meet a variety of statutory, contractual water supply, flood management, and environmental commitments. These contractual, flood management, fishery, water quality, and other environmental obligations are defined in numerous operating agreements that specify the timing, flow limits, storage amounts, and/or constraints on water releases. The relicensing of the operation of the dam is consistent with these existing commitments and no changes to the contractual obligations or to the general pattern of these releases are anticipated.

The Oroville Facilities are also important components of the Sacramento River Flood Control Project, the flood management system for areas along the Feather and Sacramento rivers downstream of Oroville Dam. The Oroville Facilities provide flood protection benefits to Oroville, other portions of Butte County, Marysville, Yuba City,

---

[11] The water valve permits access to cooler water from the bottom of Lake Oroville that is fed by the Feather River, which flows through a tunnel built during the construction of the dam to convey water from the river around the site of the dam.

other portions of Yuba and Sutter counties, and many smaller communities downstream to Sacramento. The use of the dam to control floods is governed by federal regulations issued by the U.S. Army Corps of Engineers. The Oroville Facilities also provide protection to 283,000 acres of developed agricultural lands and a variety of transportation and other public utility infrastructure. Pursuant to section 204 of the federal Flood Control Act of 1958, flood control operations at Oroville are governed by the rules and regulations prescribed by the Secretary of the Army. The Proposed Project is consistent with existing U.S. Army Corps of Engineers flood management objectives.

DISCUSSION

A.    The Federal Relicensing Procedure

In order to view the case in the proper light we start with the federal administrative procedure invoked by DWR. Under provisions of the FPA the federal and state license procedures have been melded into a single procedure called an alternative license process (ALP). It combines the federal and state environmental review process into a single process by which the affected parties, federal and state agencies, local entities (including the plaintiffs) and affected private parties,[12] agree to the terms of relicensing in a SA. The SA combines the "pre-filing consultation process, the environmental review process under the National Environmental Policy Act and administrative processes associated with the Clean Water Act and other statutes." (18 C.F.R. § 4.34(i)(2)(i) (2003).) The procedure includes "[t]he cooperative scoping of environmental issues (including necessary scientific studies), the analysis of completed studies" and "[t]he preparation of a preliminary draft environmental assessment [PDEA] or preliminary draft environmental impact statement . . . ." (18 C.F.R. § 4.34(i)(4)(ii) & (iii) (2003).) Some 52 parties

---

[12]    The settling parties include not only DWR but also the United States Department of the Interior on behalf of its component bureaus, real parties State Water Contractors, the Department of Fish and Game, and numerous local government and environmental organizations.

9

including the plaintiffs and the United States Department of the Interior, representing all interested federal agencies, participated in the process. However, the plaintiffs withdrew as parties and subsequently brought this case in the state court challenging inter alia the adequacy of CEQA treatment of global climate change.

The federal law provides for an ALP. We note that the federal administrative regulation does not refer to CEQA. (See 18 C.F.R. § 4.34(i)(6)(vii) (2003).) The purpose of the ALP is to "resolv[e] all issues that have or could have been raised by the Parties in connection with FERC's order issuing a New Project License . . . ." The SA provides that these requirements are incorporated in the license as conditions of the license.

The ALP substitutes the environmental report, normally required in an application to FERC, with a "Preliminary Draft Environmental Assessment (PDEA)." "The ALP is intended to expedite the licensing process by combining the prefiling consultation and federal and State environmental review process into a single process." After DWR submitted its draft license application and draft PDEA the stakeholders continued to negotiate and ultimately developed the SA, which was signed by 52 parties and adopted by DWR as the Proposed Project and submitted to FERC.

The SA includes "[t]he cooperative scoping of environmental issues (including necessary scientific studies), the analysis of completed studies" and "[t]he preparation of a [PDEA] . . . ." (18 C.F.R. § 4.34(i)(4)(ii) & (iii) (2003).) The purpose of the SA is to "resolve[] all issues that may arise in the issuance of all permits and approvals associated with the issuance of the New Project License, including . . . Section 401 Certification, [National Environmental Policy Act] and CEQA." The SA includes two appendices which mark the line between federal (Appendix A) and state (Appendix B) jurisdiction.[13]

_____

[13] Appendix B contains agreements by the parties that are not required by federal law including the contribution of money to construct the new facilities. No issue regarding Appendix B has been tendered.

In its federal NEPA environmental impact statement for the Project, FERC evaluated only Appendix A of the SA.

Thus, in keeping with *First Iowa,* Appendix A of the SA sets out the matters subject to federal jurisdiction. The potentially confusing aspect of the procedure is the presence of a lengthy CEQA document. It serves two purposes. It provides the underlying environmental studies supporting both the FERC application (PDEA) and the state's (SWRCB) more stringent clean water law. The environmental matter set forth in the SA is reviewable by FERC for purposes of the PDEA and by the SWRCB as a predicate for the state's more stringent water quality conditions. Thus the program in Appendix A fulfills two functions: (1) It provides the state's environmental information to meet FERC's requirements (PDEA); and (2) it supplies the environmental information from which the SWRCB develops the state's clean water law in a certificate.

That is all that is required for issuance of the FERC license. As noted, the implementation of the clean water rules is potentially subject to further CEQA review. The program contained in the Certificate provides for further studies and implementation of the state's more stringent clean water law rules *after* the issuance of the FERC license.

"[T]he SA was submitted to FERC on March 24, 2006, as supplemental information to support the license application that DWR filed in January 2005 for consideration as *future* license conditions to the Oroville license for the next 50 years."

"The objective of the Proposed Project is the continued operation and maintenance of the Oroville Facilities for electric power generation, including implementation of any terms and conditions [(adopted by the SWRCB)] to be considered for inclusion in a new FERC hydroelectric license." (Italics added.)

In this case "[t]he SA includes a commitment by DWR to develop, in consultation with stakeholders, a number of plans to enhance, protect, mitigate, restore, and/or create habitat within the FERC Project boundary. It also requires that DWR complete a number of studies and conduct monitoring to guide future decisions and activities. While these

11

. . . will likely lead to future actions that would be subject to CEQA environmental review prior to implementation . . . [they] do not result in a physical change to the environment and thus are not ready for project-specific CEQA analysis at this time."**14**

"The SA includes Appendix A, which incorporates all of the protection, mitigation, and enhancement . . . measures that the Settling Parties believe to be under FERC's jurisdiction in Proposed License Articles, and Appendix B, which includes all of the PM&E measures and other agreements that the Settling Parties believe to be outside of FERC's jurisdiction or that are commitments made by parties other than DWR."

"In general, SA Appendix A includes a commitment by DWR to develop, in consultation with stakeholders, numerous environmental plans and programs. These environmental plans and programs would improve fish spawning and rearing habitat to complement FESA anadromous fish species recovery programs, support the Feather River Fish Hatchery, provide additional habitat for waterfowl, provide protection for terrestrial FESA species, monitor water quality in project waters, improve habitat for warmwater fish species and improve the coldwater fishery in Lake Oroville, and provide new management direction for the [Oroville Wildlife Area]."

A dispute concerning "required [environmental] studies," tendered by an entity "participating" in the ALP, is subject to federal administrative review before FERC. (18 C.F.R. § 4.34 (i)(6)(vii) (2003).) Plaintiffs, as participants in the SA, tendered a dispute regarding "required studies" but failed to seek relief before FERC. Accordingly, they failed to exhaust their federal administrative remedies. The SA also contains Appendix B, which sets forth agreements by the parties not required by federal law. No such agreement is at issue in this case.

---

**14** The review of the proposed *implementation* of the changes made by the SWRCB in the Certificate is the only point at which CEQA applies to the licensing procedure.

12

B.    Federal Preemption

Federal preemption is based on the supremacy clause, which states that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2.)  There are three types of preemption:  (1) express preemption, (2) field preemption, " 'when the scope of a [federal] statute indicates that Congress intended federal law to occupy a field exclusively[,]' " and (3) conflict preemption in which " 'state law is naturally preempted to the extent of any conflict with a federal statute.' " (*Kurns v. Railroad Friction Products Corp.* (2012) 565 U.S. 625, 630.)  The FPA contains aspects of all three.

The FPA states:  "Nothing herein [16 USCS §§ 791a et seq.] contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." (16 U.S.C. § 821.)  "The Supreme Court has read the broadest possible negative pregnant into this 'savings clause.' [(*First Iowa, supra,* 328 U.S. at p. 176.)]  The rights reserved to the states in this provision are all the states get." (*Sayles Hydro Associates v. Maughan* (9th Cir. 1993) 985 F.2d 451, 454 (*Sayles Hydro*).)

With one relevant exception, the FPA occupies the field of licensing a hydroelectric dam and bars environmental review of the *federal* licensing procedure in the *state* courts. (*First Iowa, supra*, 328 U.S. 152; *California v. FERC* (1990) 495 U.S. 490; cf. *Sayles Hydro, supra*, 985 F.2d 451; *Karuk Tribe of Northern California v. California Regional Water Quality Control Bd., North Coast Region* (2010) 183 Cal.App.4th 330.)

The lead case is *First Iowa.*  A state license issued for a hydroelectric dam bypassed the federal licensing system and was enforced in the state courts.  The Supreme Court held that the federal law preempted the state law and barred its application in the *state* courts.  The court explained that under the FPA "there is a separation of those

13

subjects which remain under the jurisdiction of the states from those subjects which the Constitution delegates to the United States and over which Congress vests the Federal Power Commission with authority to act.  To the extent of this separation, the Act establishes a dual system of control.  The duality of control consists merely of the division of the common enterprise between two cooperating agencies of government, each with final authority in its own jurisdiction. . . .  A dual *final* authority, with a duplicate system of state permits and federal licenses required for each project, would be unworkable. . . .  [For that reason] [s]ection 9(c) [of the FPA] permits the Commission to secure from the [state] applicant '[s]uch additional information as the Commission may require.'  This enables it to secure, in so far as it deems material, such parts, or all of the information that the respective States may have prescribed in state statutes as a basis for state action." (*First Iowa, supra*, 328 U.S. at pp. 167-169, italics added, italics omitted, fns. omitted.)  Here that would include the CEQA document in Appendix A of the SA that is the predicate environmental study for the Certificate.  Otherwise, *First Iowa* says, the federal law would vest in a state, a veto power over a federal project.  "Such a veto power easily could destroy the effectiveness of the [FPA].  It would subordinate to the control of the State the 'comprehensive' planning which the Act provides . . . ." (*Id.* at p. 164.)  For the same reasons a state cannot delay a FERC license by issuing a certificate beyond one year of a request for a certificate.

The Supreme Court has said that the FPA preempts the field of "power development and other public uses of the waters." (*California v. FERC, supra*, 495 U.S. at p. 494.)  "*California v. FERC* reaffirms *First Iowa*, uses the 'occupy the field' characterization [of the] 'broad and paramount federal regulatory role,' *California v. FERC,* at [p.] 499, and plainly states that 'constricting § 27 [16 U.S.C. § 821] to encompass only laws relating to proprietary rights' accomplishes this 'no sharing' purpose." (*Sayles Hydro, supra,* 985 F.2d at pp. 455-456, fn. omitted.)  In *Sayles Hydro*, the Ninth Circuit recognized that "Congress has occupied the entire field, so preemption

14

will not depend on whether the state requirements conflict with the federal requirements." (*Id*. at p. 453.) Thus, pursuant to *First Iowa*, the state review of the environmental information within the jurisdiction of FERC and contained in the CEQA document cannot be used to delay the issuance of the license.

The Supreme Court also has used a conflict preemption analysis in discussing the supremacy of the FPA. "Even though the ratio decidendi in *California v. FERC* is straight 'occupy the field' preemption, the State Board correctly characterizes words used in the last part of the opinion, where the rule is applied to the facts, as conflict preemption language. The dichotomy between the two types of preemption is not so sharp in practical terms as the legal categorization makes it appear, so the mixed language has little significance." (*Sayles Hydro, supra,* 985 F.2d at p. 456.)

C.     The Clean Water Act Exception

The exception to federal jurisdiction is found in section 401 of the Clean Water Act. (33 U.S.C. § 1341.) FERC requires that every application for a federal license that may result in the discharge of pollutants into navigable waters, including pollutants from the discharge of water from a dam, must provide FERC with a *certificate* that the Project has complied with the *state law* that regulates the pollution of water. (33 U.S.C. § 1341; *S.D. Warren Co. v. Maine Bd. of Environmental Protection* (2006) 547 U.S. 370; Wat. Code, § 13160 et seq.). The term pollution includes the temperature and flow of water that impacts the lives of fish in the water below the dam. Thus, "[a]lthough 'the FPA represents a congressional intention to establish "a broad federal role in the development and licensing of hydroelectric power," ' the [Clean Water Act] 'has diminished [the FPA's] preemptive reach by expressly requiring [FERC] to incorporate into its licenses state-imposed waterquality conditions.' [Citation.] FERC's hydroelectric licenses are thus subject to, among other conditions, the requirements of section 401 of the [Clean Water Act]." (*Alabama Rivers Alliance v. FERC* (D.C. Cir. 2003) 325 F.3d 290, 292-293.) Before FERC can issue a new license to DWR, the SWRCB must first issue a

water quality certificate pursuant to section 401 of the Clean Water Act and the Porter-Cologne Act, Water Code section 13160 et seq. However, as noted, the state, including its courts, cannot delay the issuance of a certificate beyond one year from the date of a request to issue a certificate. In issuing its water quality certification, the SWRCB certifies that the Proposed Project will comply with specified provisions of the Clean Water Act, including water quality standards that are developed pursuant to state law and in satisfaction of Clean Water Act section 303 (33 U.S.C. § 1313). Preparation and certification of an EIR under the terms of CEQA and directed to the environmental effects of the state's more stringent water quality law is required *before* the SWRCB can take action. This DEIR is intended to fulfill that purpose, and considers three alternatives: the No-Project Alternative, the Proposed Project (SA), and the FERC Staff Alternative described in the FERC Draft Environmental Impact Statement (DEIS).

The SA contains appendices. It provides that the CEQA "program" in Appendix A is subject to amendment by the SWRCB to comply with the state's more stringent clean water law pursuant to section 401 of the federal Clean Water Act. The "amended program" is set forth in a certificate issued by the SWRCB as conditions to the FERC license to be implemented when imposed after the license is issued. "Preparation and certification of an EIR under the terms of CEQA is required before the SWRCB can take action." The DEIR provides that when the "amended program" in the Certificate is implemented (i.e., constructed) the *implementation* may be subject to CEQA review in the *state* courts.

In this case the Certificate includes an amendment to set water temperature requirements for the fish hatchery as required by a 1983 agreement between DWR and the Department of Fish and Game. It mandates that the water temperature of discharged water be lowered by a specified amount "[a]fter facility modifications [required by the Certificate], but no later than 10 years after [issuance of the] license." "Because of the importance of the river valve [(that permits taking water from the deepest and coolest

16

parts of Lake Oroville)] for temperature control" the Certificate also requires that "a timeline be submitted within six months of license issuance that includes the steps necessary to finalize the repair or refurbishment of the river valve."

D.     The New Project License

Although the Oroville Facilities Project that is subject to licensing is the SA, the project subject to environmental review is referred to in Appendix A as the "New Project License." It is subject to review before FERC because the applicants of the SA "participat[e] in the alternative pre-filing consultation process."[15] As the CEQA document explains, this project, does "not . . . include any annual license extending the original license" for the dam. Rather, it sets forth the environmental proposals that physically condition the new license. For this reason, it does not include the environmental effects of the operation of the dam but only the environmental effects of the projects encompassed by the New Project License, i.e., the projects listed in the Certificate.

A source of confusion is the classification of the overall project subject to the FERC license as the Oroville Dam and Oroville Facilities Project. However, the project subject to environmental review in this case is not the existing dam and facilities but the project to further mitigate the loss of habitat caused by the construction of the dam, and that is referred to as the New Project License. This project would increase the habitat along the lower reaches of the Feather River, open a water valve to access colder water at the bottom of Lake Oroville to meet hatchery temperature requirements, improve the spawning of fish by channel and gravel improvement plans, and regulate the flow of

---

**15**     Title 18 Code of Federal Regulations part 4.34(i)(6)(vii) (2003) provides in relevant part: "Any potential applicant, resource agency, Indian Tribe, citizens' group, or other entity participating in the alternative pre-filing consultation process may file a request with the Commission to resolve a dispute concerning the alternative process (*including a dispute over required studies*) . . . ." (Italics added.)

17

water from the dam.[16] Only the *implementation* of the conditions set forth in the Certificate relating to the state's clean water law, some of them to be completed years after the license is issued, is subject to *independent* CEQA review in the state courts.

There is an extensive CEQA document (DEIR) in the record and it is this document that the plaintiffs rely on in their CEQA challenge. As noted, it serves two purposes. First, it satisfies the state's obligation to provide environmental information to FERC. Second, it is used "to evaluate the potential effects of implementing the SA as new license terms and conditions for the continued operation of the hydroelectric component of the Oroville Facilities." That, however, is reviewable before FERC as general conditions for the operation of the dam.

The federal law has its own means of review of contested issues in the settlement process. Under 18 Code of Federal Regulations part 385.602(h)(1)(i) (2003), if FERC determines that any offer of settlement is contested by any party, the Commission may decide the merits of the issues if the record contains substantial evidence upon which to base a reasoned decision or it determines there is no genuine issue of material fact.[17] (18 C.F.R. § 385.602(h)(1)(i) (2003).)

Second, the DEIR provides an analysis for the preparation of a "water quality certification for the Proposed Project from the [SWRCB] under Section 401 of the [federal] Clean Water Act." The primary purpose of the DEIR is "to identify . . . any

---

**16**    Insofar as the implementation of the changes made by the SWRCB to the "New Project License" (Appendix A) are subject to CEQA analysis it is programmatic. (Pub. Resources Code, §§ 21093, 21094.) The CEQA "program" is set forth in Appendix A as the environmental predicate for the Certificate. As noted, the CEQA "program" set forth in Appendix A is subject to *federal* administrative review before FERC pursuant to NEPA. (18 C.F.R. § 4.34(i)(6)(vii) (2003).)

**17**    If the Commission determines that the record does not contain substantial evidence, the Commission has the option to take other action which the Commission determines to be appropriate. (18 C.F.R. § 385.602(h)(1)(ii)(B) (2003).)

18

potential . . . environmental impacts that may result from *implementation* of" the New Project License. It provides for environmental studies that support the changes made by the SWRCB in the Certificate. To the extent that CEQA applies to the Certificate it is to the proposed implementation of the changes by the SWRCB. (See 33 U.S.C. § 1341(d).) Appendix A also functions as a PDEA, an "analysis required under [the federal] NEPA in support of relicensing."

In this respect the state laws are not a part of relicensing and cannot be used to delay relicensing by resort to the state courts. The SA is clear that the purpose of the SA is to "resolv[e] all issues that have or could have been raised by the Parties in connection with FERC's order issuing a New Project License . . . ." "[I]t is the Parties' intention that this [SA] also resolves all issues that may arise in issuance of all permits and approvals associated with the issuance of the New Project License, including but not limited to . . . CWA [Clean Water Act] Section 401 Certification, NEPA and CEQA."

Although "[t]he DEIR analyzes the potential impacts of implementing the SA including *all* its appendices, as DWR's proposed project," the matters subject to environmental review by the state required to obtain an extended license include only the matters in Appendix A. The state's environmental information provided in Appendix A, which is expressly made subject to federal jurisdiction, satisfies the state's environmental obligation with respect to the federal license. It also provides the environmental information in support of the programmatic portion of the New Project License which is the environmental predicate for review of the "program" by the SWRCB for compliance with the state's more stringent clean water law.

The program set forth in the "New Project License" was submitted to the SWRCB for its review pursuant to the California Clean Water Act. (Porter-Cologne Act, Wat. Code, § 13160 et seq.) The changes made to the program are set forth in a Certificate (adopted December 15, 2010, two years after the filing of this action). The Certificate

19

has not been filed with FERC because of the pendency of this action.[18]  The CEQA document asserts only that the changes made to the program by the SWRCB in the Certificate are subject to CEQA review in the state courts when *implemented after* the Certificate is submitted to FERC *and* the license issued.

Neither the program subject to the SWRCB review, nor the Certificate by which SWRCB exercises its section 401 authority to *implement* the provisions of Appendix A are the subject of plaintiffs' petition.  Because the plaintiffs' petition was filed in the state court two years before the SWRCB adopted the Certificate, no issue is tendered concerning the changes the Certificate makes to the program, and no action under CEQA to review the changes can be filed in a state court until *after* the license is issued and the changes implemented.  As a consequence, they have not tendered a question of how the CEQA part of the section 401 review meshes with the non-CEQA part of the licensing process.

E.      *Eel River*

As indicated, the Supreme Court has directed us to vacate our prior decision and reconsider the case in light of *Eel River*.  Having done so, we hold once again that this court has no jurisdiction because federal law preempts CEQA under the circumstances presented.

The issue in *Eel River* was whether the ICCTA preempted the application of CEQA to a project to resume freight service on a stretch of railroad line owned by the North Coast Railroad Authority.  (*Eel River, supra*, 3 Cal.5th at pp. 692, 700, 702.)  The California Legislature created the North Coast Railroad Authority and gave it the power to acquire property and to operate a railroad.  (*Id*. at p. 692.)  Thus, the railroad was to be owned by a subsidiary of the state.

---

[18]      The plaintiffs rely on CEQA case authority to stay the relicensing procedure pending *state* judicial review of the DWR's approval of the project.  (*Santiago County, supra,* 118 Cal.App.3d at p. 829.)

The ICCTA contained an express preemption provision, which stated in pertinent part: " 'The jurisdiction of the [Surface Transportation Board] over—[¶] (1) transportation by rail carriers . . . [,] and [¶] (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, [¶] is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.' " (*Eel River, supra*, 3 Cal.5th at p. 706.) Accordingly, the Supreme Court acknowledged that as to privately-owned railroads, the ICCTA preempted CEQA. (*Id*. at p. 703.)

Significantly, in spite of the express preemption provision, *Eel River* looked to the purpose and history of the ICCTA, to conclude that although the preemption of state regulation of rail transportation had a long history, more recent enactments sought to achieve broad deregulation. (*Eel River, supra*, 3 Cal.5th at p. 708.) The court opined that the purpose of the ICCTA was "deregulatory." (*Id*. at p. 691.) Because of this deregulatory purpose, the state was left with an area of autonomy in which it could choose to self-govern on matters of the environment. (*Id*. at p. 704.)

*Eel River* recognized that federal remedies preempt state remedies " 'with respect to regulation of rail transportation.' " (*Eel River, supra*, 3 Cal.5th at p. 711.) Central to *Eel River's* analysis was "whether application of CEQA to the rail carriers in this case would constitute regulation of rail transportation within the terms of the ICCTA." (*Ibid*.) The case held that application of CEQA to private rail carriers would be a regulation preempted by federal law. (*Id*. at p. 720.) However, the court reasoned that while CEQA's restriction of a private party's ability to develop property is plainly regulatory, when the state or a subdivision of the state is the property owner, CEQA operates not as a regulation, but as a form of self-government. (*Id*. at p. 723.) Thus, CEQA is not a

21

preempted regulation when applied to state-owned projects, or projects owned by a subdivision of the state.

*Eel River* stated that because of the deregulatory purpose of the ICCTA, private railroad owners have the "freedom to plan, develop, and restore rail service on market principles but within the framework of modest federal regulation[,]" such that "the [private] owner may carry out its activities according to its own corporate goals and in response to market forces." (*Eel River, supra*, 3 Cal.5th at p. 724.) The court reasoned that as private owners are accorded the freedom to make decisions based on their own internal guidelines, so too must the state as owner be able to make decisions based on its own guidelines, CEQA being one of those guidelines. (*Ibid.*) Thus, in the case of the ICCTA, which purpose is to deregulate the railroad industry, CEQA is not a preempted regulation when applied to a state-owned project, but is merely an expression of self-governance.

*Eel River* also relied on two presumptions in reaching its decision. The first is the presumption that when Congress adopts a preemption provision, it does not intend to deprive a state of its sovereign authority over its internal governance without a clear statement of intent. (*Eel River, supra*, 3 Cal.5th at p. 725.) However, as we explain below, the United States Supreme Court has rejected this presumption with respect to the FPA. The second presumption the court relied on was the market participant doctrine. (*Id.* at p. 734.) The court described this doctrine as the circumstance where states act, "not as regulators of *others*, but as participants in a marketplace who *themselves* need to deal with private parties to obtain services or products." (*Ibid.*) In this capacity states should have the same freedom as private actors in the market. (*Ibid.*) As discussed further, the doctrine does not apply here.

1.     FPA Does Not Have a Deregulatory Purpose

Critical to *Eel River's* conclusion that the ICCTA did not preempt CEQA was "the deregulatory aspect of the ICCTA and the different way in which deregulation affects

22

public and private rail lines." (*Eel River, supra*, 3 Cal.5th at p. 734.) The ICCTA expressly provides that it is the policy of the federal government, inter alia, "to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail[,]" "to minimize the need for Federal regulatory control over the rail transportation system[,]" and "to reduce regulatory barriers to entry into and exit from the industry." (49 U.S.C. § 10101.)

*Eel River* reasoned that because of this deregulatory feature of the ICCTA, private railroad owners were free to make market-based decisions without an undue level of regulation of any kind, relying instead on their own internal corporate rules and bylaws to guide market-based decisions. (*Eel River, supra*, 3 Cal.5th at p. 691.) The court reasoned that a government-owned railroad must have the same "sphere of freedom of action[,]" and that state laws are the state's expression of its decisions, similar to corporate rules and bylaws. (*Ibid*.) "This is how the deregulatory purpose of the ICCTA necessarily functions when state-owned, as opposed to privately owned, railroad lines are involved." (*Ibid*.)

By contrast, there is no deregulatory feature of the FPA. Instead, the "purpose, structure, and legislative history of the [FPA]" shows that it "envisioned a considerably broader and more active federal oversight role in hydropower development . . . ." (*California v. FERC, supra*, 495 U.S. at p. 492 [comparing the FPA to the Reclamation Act].) FERC's planning authority over hydropower development is "comprehensive." (*Id*. at p. 506.) The Ninth Circuit has stated that the FPA, read in its entirety, was intended "to vest final authority for the regulation of hydroelectric power projects in federal hands." (*State of California ex rel. State Water Resources Bd. v. FERC* (9th Cir. 1989) 877 F.2d 743, 746.) The FPA authorizes FERC to issue licenses to construct, operate, and maintain dams, water conduits, reservoirs, and powerhouses, and to develop, transmit, and utilize power in any of the streams over which Congress has jurisdiction. (*Id*. at p. 747.) FERC has the authority to order any project modified " 'for the

23

improvement and utilization of water-power development.' " (*Ibid*.) FERC has "general planning power," as well as specific powers "to issue preliminary permits," "investigate power development resources," "mandate prompt construction schedules," "grant licenses," "control the precise terms of the license," "and to award powers of eminent domain to licensees." (*Ibid*.)

The rationale behind *Eel River* is that because of the ICCTA's deregulatory sweep, it protects a "zone of autonomy belonging to the state when it is the owner, such that within the deregulated zone, the state as owner may make its decisions based on its own guidelines rather than some anarchic absence of rules of decision." (*Eel River, supra*, 3 Cal.5th at p. 724.) In this zone of autonomy, the state must have leave to self-govern as if it were a private owner. However, in the case of the FPA, there is no "zone of autonomy" because the FPA was not designed with a deregulatory purpose. Without a zone of autonomy or "sphere of regulatory freedom," application of CEQA to a public project is not merely self-governance. Rather, the application of the state law encroaches on the regulatory domain of the FPA. (See *id.* at pp. 691, 723.)

The United States Supreme Court has opined that the field of hydropower licensing is highly regulated by the FPA. "The detailed provisions of the [FPA] providing for the federal plan of regulation leave no room or need for conflicting state controls." (*First Iowa, supra,* 328 U.S. at p. 181.) "By directing FERC to consider the recommendations of state wildlife and other regulatory agencies while providing FERC with final authority to establish license conditions (including those with terms inconsistent with the States' recommendations), Congress has amended the FPA to elaborate and reaffirm First Iowa's understanding that the FPA establishes a broad and paramount federal regulatory role." (*California v. FERC, supra,* 495 U.S. at p. 499.) The Ninth Circuit has agreed. "Congress has occupied the entire field, so preemption will not depend on whether the state requirements conflict with the federal requirements.

24

Second, occupation of the field implies as a corollary that the state process itself, regardless of the results, is preempted." (*Sayles Hydro, supra,* 985 F.2d at p. 453.)

The Ninth Circuit even directly addressed the preemption of state environmental laws, saying, "There would be no point in Congress requiring the federal agency to consider the state agency recommendations on environmental matters and make its own decisions about which to accept, if the state agencies had the power to impose the requirements themselves." (*Sayles Hydro, supra,* 985 F.2d at p. 456.) In California, one court has "recognized that for at least half a century federal law has been supreme when it comes to the subject of regulating hydroelectric dams operating under a federal license[,]" and stated that "the FPA occupies the field of hydropower regulation." (*Karuk Tribe of Northern California v. California Regional Water Quality Control Bd., North Coast Region, supra*, 183 Cal.App.4th at pp. 335, 359.)

Unlike the ICCTA, which does not specifically indicate that the federal government has regulatory authority over the preservation of the environment, the FPA expressly authorizes FERC to consider environmental protection when issuing licenses.[19] The FPA authorizes FERC to issue licenses to "any State or municipality for the purpose of . . . operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works . . . for the development, transmission, and utilization of power across . . . any of the streams . . . over which Congress has jurisdiction . . . ." (16 U.S.C. § 797(e).) Furthermore, FERC, "in addition to the power and development purposes for which licenses are issued, shall give equal consideration to . . . the protection, mitigation of damage to, and enhancement of, fish and wildlife

---

[19]    With regard to the regulation of solid waste rail transfer facilities, the ICCTA states that it is not intended "to affect the traditional police powers of the State to require a rail carrier to comply with State and local environmental, public health, and public safety standards that are not unreasonably burdensome to interstate commerce and do not discriminate against rail carriers." (49 U.S.C. § 10910.)

(including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality." (*Ibid.*)

FERC's published Processes for Hydropower Licenses specifically provides for environmental analyses.[20] FERC Guidelines state that the ALP includes in its collaborative process the evaluation of the environmental impacts of the Project pursuant to NEPA. Other federal laws intersect with the hydropower licensing process, which duplicate the impacts considered in a CEQA review. These include the federal Clean Water Act, the federal Endangered Species Act, the Fish and Wildlife Coordination Act, the Magnuson-Stevens Fishery Conservation and Management Act, the National Historic Preservation Act, and the Wild and Scenic Rivers Act. Legislation amending the FPA has been passed for the purpose of "assuring adequate environmental protections . . . ." (H.R.Rep. No. 99-507, 2d Sess., p. 10 (1986).)

The FPA has occupied the field of regulating hydropower projects, leaving no sphere of regulatory freedom in which state environmental laws may operate as self-governance. Instead, such laws directly encroach on the province of FERC under the FPA.

2.      Congress's Intent to Preempt State Law Is Unmistakably Clear

*Eel River* concluded that the ICCTA did not preempt CEQA because "Congress does not intend to deprive the state of sovereignty over its own subdivisions" "in the absence of unmistakably clear language." (*Eel River, supra*, 3 Cal.5th at p. 690.) Appellants argue this presumption is dispositive here. The United States Supreme Court has held otherwise. The question before the court in *California v. FERC, supra,* 495 U.S. 490 was not the environmental consequence of the of the hydroelectric project, but

---

[20]     We grant the request of the State Water Contractors et al., to judicially notice the published FERC Processes for Hydropower Licenses and FERC Guidelines, as well as the excerpts from the House of Representative Conference Reports relating to amendments to the FPA.

whether section 27 of the FPA (16 U.S.C. § 821) was intended to preempt California's laws requiring minimum stream flows. (*California v. FERC,* at p. 497.) The petitioner argued that there was a " 'presumption against finding pre-emption of state law in areas traditionally regulated by the States' and ' "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." ' " (*Ibid.*)

In response to this argument the Supreme Court stated: "But the meaning of § 27 [16 U.S.C. § 821] and the pre-emptive effect of the FPA are not matters of first impression. Forty-four years ago, this Court in First Iowa construed the section and provided the understanding of the FPA that has since guided the allocation of state and federal regulatory authority over hydroelectric projects. . . . [¶] . . . This Court has endorsed and applied First Iowa's limited reading of § 27, [citations], and has employed the decision with approval in a range of decisions, both addressing the FPA and in other contexts. [Citations.] By directing FERC to consider the recommendations of state wildlife and other regulatory agencies while providing FERC with final authority to establish license conditions (including those with terms inconsistent with the States' recommendations), Congress has amended the FPA to elaborate and reaffirm First Iowa's understanding that the FPA establishes a broad and paramount federal regulatory role." (*California v. FERC, supra,* 495 U.S. at pp. 497-499.)

As the United States Supreme Court has stated, the preemptive effect of the FPA has been litigated repeatedly since *First Iowa*. The exceptions to the FPA's preemptive effect are limited and are specified in the statute. There is no exception for the application of a state's environmental laws, therefore the presumption employed by *Eel River* is not applicable to this case.

27

3.  Market Participant Doctrine

*Eel River* did not find the market participant doctrine "fully on point," but found elements of case law concerning the doctrine "instructive." (*Eel River, supra*, 3 Cal.5th at pp. 736-737.) We fail to see how the market participant doctrine applies here at all.

The United States Supreme Court first articulated the market participant doctrine in *Hughes v. Alexandria Scrap Corp*. (1976) 426 U.S. 794 (*Hughes*). The issue arose when a Virginia scrap processor brought an action challenging the constitutionality of a Maryland law by which the state of Maryland would pay scrap processors a "bounty" for the destruction of old, inoperable automobiles. The purpose of the law was to deal with the aesthetic problem of abandoned automobiles. (*Id*. at p. 796.) The law required the processors to provide title documentation to the state, and the documentation required of out-of-state processors was more extensive than the requirement for in-state processors. (*Id*. at p. 800.)

The Virginia processor argued the law violated the commerce clause by burdening the flow of abandoned automobiles across state lines. (*Hughes, supra*, 426 U.S. at p. 802.) The Supreme Court disagreed. The court reasoned that the purpose of the commerce clause was to prevent trade barriers between the states so that citizens would have free access to every market in the nation without embargos, customs, duties, or regulations. (*Id.* at pp. 807-808.) But, the commerce clause does not prohibit a state "from participating in the market and exercising the right to favor its own citizens over others." (*Id*. at p. 810.)

Where the preemptive law in question prohibits state laws and regulations in the subject area, a state acting as a participant in the market in a narrow and focused manner consistent with the behavior of other market participants, does not constitute regulation subject to preemption. (*Cardinal Towing & Auto Repair, Inc. v. City of Bedford* (5th Cir. 1999) 180 F.3d 686, 691.)

28

Here, the state action in question, i.e., the state act which is arguably subject to preemption, is not California's operation of a hydroelectric dam. It is California's imposition of CEQA in the FERC licensing process. The CEQA laws are not narrow and focused actions consistent with the behavior of other market participants. They are regulatory acts pure and simple, and are subject to preemption.

F.    The Parties' Status

The plaintiffs participated extensively in the ALP but refused to sign the SA. As a consequence, they are not parties to the SA and have no procedural rights pursuant to its internal review procedures in Appendix B of the SA to dispute the agreement of the parties.[21] Nor did the plaintiffs seek administrative review of the New Project License before FERC as required by 18 Code of Federal Regulations part 4.34(6)(vii) (2003). Instead, on August 21, 2008, they filed a CEQA complaint for a writ of mandate in the superior court challenging the environmental effects of climate change on the *operation* of the dam and facilities for all the purposes served by the SWP. It is the propriety of the appeal from the judgment of the superior court in that action that we consider.

The plaintiffs argue that the SA applies only to entities that have signed the SA as parties. That is true, but the source of the plaintiffs' contractual rights, if any, is the SA. There is one remedy for which status as a party is not required, and it is a federal remedy for the violation of the environmental requirements of federal law. "Any . . . entity participating in the alternative pre-filing consultation process may file a request with the Commission to resolve a dispute concerning the alternative process (including a dispute over *required studies*) . . . ." (18 C.F.R. § 4.34(i)(6)(vii) (2003), italics added.) The plaintiffs participated extensively in the pre-filing consultation process and tendered essentially the same climate change argument and supporting data for consideration by

---

**21**    The internal review procedures apply to matters agreed to by the parties that are not subject to FERC review, such as the provision of funds to carry out the agreements. As noted, no such issue is tendered in this action.

29

the SA in their opening brief as CEQA claims, but refused to sign the SA as a party. Since the plaintiffs are not parties to the SA and did not utilize its administrative process they have no rights under the SA and cannot challenge the provisions of the SA relating to Appendix B.

The plaintiffs alleged that the SA did not consider the impact of global climate change on DWR's *continued operation* of the existing dam and facilities for the purposes served by the SWP. They argue that "[c]limate change will almost certainly affect the project's ability to meet water supply, water temperature, water quality, flood management, and recreational requirements, thus severely impacting human populations and ecosystems."[22] A project subject to CEQA review involves the environmental consequences of a physical change in the environment. Since no physical changes are planned for the dam itself,[23] other than the reopening of the water valve, the plaintiffs assume the project subject to environmental review is the DWR's *operation* of the dam as part of the SWP.

---

[22] In their initial briefing, the plaintiffs challenged the project description as "truncated," as failing to include all the uses to which water from the dam would be put pursuant to the SWP. These are referred to as "project operations." The plaintiffs argue: "Climate change will almost certainly affect the project's ability to meet water supply, water temperature, water quality, flood management, and recreational requirements, thus severely impacting human populations and ecosystems. DWR's own report discusses several impacts but never analyzes them in light of climate change due to the EIR's erroneous assumption of stationarity." (Fn. omitted.) " '[R]eservoirs will likely experience changes in the rate and timing of inflow. Changes in reservoir operations and reduced annual storage in snowpack could result in less water being available in the summer and fall to meet Delta outflow and salinity requirements.' "

It is true that changes in the earth's climate could affect the temperature or flow of water to the new environmental project, but as noted, any such argument must be made when the project in the Certificate is implemented.

[23] See footnote 1, *ante*.

The plaintiffs do not claim that, given climate change, the environmental measures in Appendix A would *cause* an environmentally *harmful* physical change in the environment, since Appendix A is designed to ameliorate environmental harms caused by the existing dam. Rather, they claim that the impact of climate change on the *continued operation* of the dam would affect the DWR's ability to carry out the purposes served by the SWP.

The respondents reply that the impact of climate change on the *operation* of the dam is too speculative to require consideration under CEQA. The superior court agreed and entered a judgment in favor of the respondents. This is the posture in which the appellate case was initially briefed.

The operation of the existing dam and facilities, however, is not the project subject to *environmental* review. The project subject to review is labeled the New Project License and expressly does "not . . . include any annual license extending the original license . . . ." The New Project License does include new spawning grounds for anadromous fish and changes in the temperature and flow of water from the dam to improve the spawning and survivability of the fish. It is subject to review by the SWRCB for compliance with California's clean water laws.

The parties were likely misled by the lengthy CEQA document in the record that includes a CEQA review of the environmental consequences of relicensing the existing dam. From this premise the plaintiffs argue that DWR should have considered the project subject to environmental review as the environmental impact of climate change on the *operation* of the dam and facilities, as part of the SWP, and that, as a result, the DWR failed to consider the consequences of climate change on the operation. It was on this basis that the plaintiffs claimed the decision to approve the project and issue the license should be stayed pending a state court resolution of their CEQA claims. (*Santiago County, supra*, 118 Cal.App.3d at p. 829.)

31

The plaintiffs' primary mistake is that the project subject to environmental review by the state is not the dam and facilities as built, but the project to further mitigate the loss of habitat caused by construction of the dam in 1967, increasing the habitat along the lower reaches of the Feather River, opening a water valve to access colder water at the bottom of Lake Oroville to meet hatchery temperature requirements, improving the spawning of fish by channel and gravel improvement plans, and regulating the flow of water from the dam.

The correct view of the project tenders questions of *federal* administrative and substantive law applicable to the relicensing of a hydroelectric dam and its facilities.

DISPOSITION

The plaintiffs cannot challenge the environmental sufficiency of the program in Appendix A because review of that program lies with FERC and they did not seek review as required by 18 Code of Federal Regulations part 4.34(i)(6)(vii) (2003). The plaintiffs cannot challenge the environmental predicate to the Certificate contained in the CEQA document because that is subject to review by FERC. The plaintiffs cannot challenge the Certificate because it did not exist when this action was filed, and they cannot challenge the physical changes made by the SWRCB in the Certificate until they are implemented. For these reasons the parties have not tendered a federal issue over which this court has state CEQA jurisdiction. Accordingly, we shall dismiss the appeal with directions to the trial court to vacate its judgment and dismiss the action for lack of subject matter jurisdiction. Costs are awarded to respondents. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

                                        /s/
                                        BLEASE, J.


We concur:


 /s/
RAYE, P. J.


 /s/
HULL, J.